**John M. HODGENS, Plaintiff, Appellant,**

v.

**GENERAL DYNAMICS CORPORATION,**
**Defendant, Appellee.**

No. 97–1704.

United States Court of Appeals,
First Circuit.

Heard Dec. 1, 1997.

Decided May 21, 1998.

Patricia E. Andrews, for appellant.

Barbara L. Sloan, Attorney, C. Gregory Stewart, General Counsel, J. Ray Terry, Jr., Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, and Lorraine C. Davis, Assistant General Counsel, on brief, for Equal Employment Opportunity Commission, amicus curiae.

Lynette Labinger, Roney & Labinger, Christopher M. Mulhearn, Tate & Elias on brief, for Rhode Island Affiliate American Civil Liberties Union, amicus curiae.

Neal J. McNamara, for appellee.

Corrie L. Fischel, Ann Elizabeth Reesman, and McGuiness & Williams on brief for Equal Employment Advisory Council, amicus curiae.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is the first time we have had occasion to construe the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601–2619 (1994), which established important rights that protect millions of American employees.

Plaintiff John Hodgens sued his former employer, General Dynamics Corporation

("General Dynamics" or "GD"), for allegedly terminating his employment because he took necessary medical leave that was protected under the FMLA. His complaint further alleged that his discharge constituted discrimination based on his disability (high blood pressure and atrial fibrillation), in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101–12213 (1994). The district court granted GD's motion for summary judgment. The court found that Hodgens's leave was not protected under the FMLA because he did not have a "serious health condition," as required by the Act. 29 U.S.C. § 2612(a)(1)(D). And the court rejected his ADA claim on the ground that his medical condition, after taking account of mitigating treatment, did not constitute a disability within the meaning of the ADA. 42 U.S.C. § 12102(2)(A). Although we rely on different reasoning, we affirm the grant of summary judgment.

### Facts

We recount the facts and draw all reasonable inferences in the light most favorable to Hodgens, as we must when we review a grant of summary judgment. See DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). From 1964 until 1985, Hodgens worked for General Dynamics at its Quincy, Massachusetts location. The facility was closed and Hodgens was laid off in 1985. In approximately February 1988, General Dynamics hired Hodgens as a Senior Planner at its Quonset Point (R.I.) facility. He worked in the program planning area until September 1991.

His performance was evaluated quite highly during his years in program planning. GD's evaluation system (as applied to his positions with the company) consisted of an annual ranking, covering the period beginning March 1 of one year through the end of February of the next. Similarly situated employees (in the same or similar job titles, pay grades, etc.) were placed in "peer" or "rank" groups and then numerically "ranked" based on performance. The employees in a particular rank group were evaluated by all supervisors of such employees, at a meeting where performance was discussed and rankings determined by consensus. During the three years in which Hodgens worked in program planning, he was ranked first (among four or five) in his peer group.

In September 1991, the program planning function at Quonset Point was eliminated and Hodgens was reassigned to the production control area, where he worked until his termination in July 1994. Unlike program planning—where Hodgens had tracked costs and performed a data auditing function, not requiring a deep knowledge of construction procedures—production control was "hands on" work, requiring familiarity with the details of submarine hull and components manufacturing. Because Hodgens had not previously done this type of work, he was at a disadvantage relative to his co-workers who did have such experience. As a result, Hodgens's performance fell. In 1992, he was ranked eighth of ten; the employees who ranked ninth and tenth were laid off that year as part of a reduction in force ("RIF"). In 1993, Hodgens ranked seventh of eleven in his rank group. Hodgens was concerned about his performance in production control, and especially worried about the possibility that his low performance might lead to his being laid off if there were to be another RIF.

For his first two years in production control, Hodgens performed sound dampening functions (a process by which submarines are soundproofed). He performed this part of his duties in a satisfactory manner; his last evaluation covering the period 1993–94 stated that he did an "excellent job in sound dampening." At some point during this period, however, GD decided to change its employees' responsibilities from specializing in a particular function to include all aspects of a project. Hodgens was assigned to "Module 82," an area on the Seawolf submarine. His duties included monitoring and facilitating the work on the module, filling work orders, maintaining proper material flow, and solving production problems. He worked on Module 82 between April and the beginning of August 1993.

It was during this period that Hodgens began to experience medical problems, including chest pains, visual problems, and pro-

fuse perspiration. These began in approximately June or July 1993. On August 4, he began to see his doctor, Dr. Joanne Wilkinson. She was "most concerned" that his symptoms, coupled with his history of hypertension (high blood pressure or HBP), might indicate that he was suffering from angina, which could be extremely serious or even fatal. She therefore advised Hodgens to undergo a stress test and an electrocardiogram (EKG). Dr. Wilkinson continued to see Hodgens on frequent occasions throughout August, during which time she was unable either to make a diagnosis or to rule out angina. During some of these visits, Hodgens's blood pressure was "way up," and Dr. Wilkinson continued to treat Hodgens as if he had angina.

During the period of these visits, from August 4 until September 27, Hodgens did not return to work. According to him, this was because of his need for numerous visits to Dr. Wilkinson and other physicians for evaluation and treatment, and because he wanted to be sure he did not do anything that might aggravate any potential heart condition. Dr. Wilkinson testified at her deposition that she thought it was "reasonable" for Hodgens to stay home from work until he got the results of his stress test, although, if her patient had wanted to return to work during the interim, she would have been "comfortable" with that.

Dr. Wilkinson also treated Hodgens for hypertension, prescribing a combination of medications, and for acute anxiety reactions. As part of the treatment for the latter, Dr. Wilkinson referred Hodgens to a psychologist for counseling to help reduce his stress. According to Hodgens's testimony, he had never previously experienced the degree of stress that he experienced in Module 82. Dr. Wilkinson also referred Hodgens to Dr. Jacobs, an ophthalmologist, because of his visual problems. Dr. Jacobs determined that he was suffering from migraine auras.

On September 13, 1993, Dr. Wilkinson told Hodgens that the results of his EKG, MRI and stress test were normal. She was able to rule out a stroke or a serious neurological problem, but she was still unable to rule out the possibility of angina. Nevertheless, she cleared Hodgens to return to work as of September 20. He did not return on that day, however, because he felt ill in his car and had to return home. He did return to work on September 21. As a matter of General Dynamics policy, GD's company nurse had to examine any employee, such as Hodgens, who had been out of work for more than five days because of illness. During her examination, the nurse detected that Hodgens was experiencing atrial fibrillation (irregular heartbeat) and that his blood pressure was elevated. She therefore refused to allow him to return to work and suggested that he see his doctor immediately.

Hodgens did so, and Dr. Wilkinson diagnosed him as suffering from atrial fibrillation, a serious and potentially life-threatening heart condition. After treating him, by prescribing medication to thin his blood in order to prevent a stroke, Dr. Wilkinson told Hodgens he could return to work on September 27. She restricted him to working half-days during the first week, and to working a light-duty schedule for the following three weeks.

Hodgens returned to work on September 27. General Dynamics changed his assignment so that he was no longer part of a module; according to GD, Module 82 was nearing completion. Instead, until December 1993, Hodgens was assigned exclusively to performing sound dampening tasks.

Shortly thereafter, Hodgens had to take additional intermittent medical leave to deal with an ear problem. His hearing problem manifested itself on September 29, 1993, and he saw a physician six times in three months. On January 7, 1994, he had ear surgery on an outpatient basis. The surgery left him dizzy and fatigued; in order to recuperate, he required medication and bed rest for several days. He returned to work on January 11. In February, he was assigned to the machine shop (GD says this was in March). Here, his duties were, according to Hodgens, "low-level, demeaning, and not the type normally performed by Senior Planners." He was no longer performing sound dampening duties. Instead, another employee was assigned to those duties, an employee who Hodgens claims was less experienced and less qualified to perform them.

In April 1994, Hodgens asked his new supervisor for vacation leave to handle a family emergency. His supervisor responded that he was taking "too much time off," and issued a verbal warning about his attendance.

On May 10, Hodgens met with his former supervisor, and received his annual evaluation covering the period March 1993 through February 1994. The evaluation contained the statement: "Make every effort to have your absenteeism fall within the company guidelines."

At the same May 10 meeting, the supervisor told him he was being laid off for lack of work, effective July 8, 1994. His performance had been ranked seventh among seven members of his rank group for the year ending February 1994.

Hodgens brought suit in district court, alleging that his termination violated the FMLA because it was an adverse action taken on the basis of his having availed himself of protected leave. He also alleged that it violated the ADA because it was based on his disabilities.[1] General Dynamics filed a motion for summary judgment, contending that Hodgens failed to establish a prima facie case under the FMLA because he did not suffer from a "serious health condition." GD also argued that Hodgens is not protected by the ADA because his conditions did not constitute a "disability." The district court granted GD's motion. According to the court, "an employee's absence [from work] must be necessary to enable the employee to receive treatment. If an employee can obtain treatment without missing work, any period of absence cannot be attributed to the need to receive treatment." As for the ADA, the court held that, taking into account the ameliorative effects of Hodgens's medications, his medical conditions did not constitute a disability under the ADA.

I

We review grants of summary judgment de novo. *Dubois v. United States Dep't of Agric.,* 102 F.3d 1273, 1283 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

" 'The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *DeNovellis,* 124 F.3d at 305–6 (quoting Fed. R.Civ.P. 56(e) advisory committee's note to 1963 Amendment). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor. *Id.* at 322–25, 106 S.Ct. 2548. At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he would bear the ultimate burden of proof at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Celotex,* 477 U.S. at 321–23, 106 S.Ct. 2548.

---

**1.** In addition to his claims under the federal FMLA and ADA, Hodgens made similar claims under the corresponding provisions of the Rhode Island Parental and Family Medical Leave Act, R.I. Gen. Laws § 28–48–1 *et seq.*, and the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28–5–1 *et seq.* These state laws require essentially the same elements as the corresponding federal laws. Therefore, our disposition of

the federal claims likewise disposes of the parallel state law claims. Hodgens also made claims under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and under the Rhode Island Civil Rights Act, of 1990, R.I. Gen. Laws § 42–112–1(a). The district court granted summary judgment against him on these claims, and Hodgens has not appealed.

## II

■ Because our circuit has not previously had occasion to consider the Family and Medical Leave Act of 1993, we set forth some background at the outset. "The FMLA was enacted to help working men and women balance the conflicting demands of work and personal life. It does so by recognizing that there will be times in a person's life when that person is incapable of performing her duties for medical reasons." *Price v. City of Fort Wayne*, 117 F.3d 1022, 1024 (7th Cir. 1997).

The twin purposes of the FMLA are to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(1) & (2). Among the findings prompting the Act was Congress's belief that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). The FMLA seeks to accomplish its purposes "in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(3).

The FMLA contains two distinct types of provisions. First, it creates a series of substantive rights. Eligible employees "shall be entitled" to up to twelve weeks of unpaid leave per year for any one of the following purposes: when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position," 29 U.S.C. § 2612(a)(1)(D); to care for a close family member with such a condition, 29 U.S.C. § 2612(a)(1)(C); or because of the birth, adoption, or placement in foster care of a child, 29 U.S.C. § 2612(a)(1)(A) & (B). *See also* 29 U.S.C. § 2611(11); 29 C.F.R. §§ 825.100(a), 825.114

(1997) (defining a "serious health condition"). Following a qualified absence, the employee is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority. 29 U.S.C. § 2614(a)(1); 29 C.F.R. §§ 825.100(c) (1997). The FMLA also provides for "intermittent" leave, which allows an employee to take such leave intermittently "when medically necessary," such as to attend appointments with a health care provider for necessary treatment of a serious health condition. 29 U.S.C. § 2612(b); 29 C.F.R. § 825.117 (1997) (defining requirements for intermittent leave).

■ These rights are essentially prescriptive, "set[ting] substantive floors" for conduct by employers, and creating "entitlements" for employees.[2] *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712–13 (7th Cir.1997). As to these rights, therefore, the employee need not show that the employer treated other employees less favorably, and an employer may not defend its interference with the FMLA's substantive rights on the ground that it treats all employees equally poorly without discriminating. *Id.* at 712. In such cases, the employer's subjective intent is not relevant. The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.

In addition to creating the above entitlements, the FMLA provides protection in the event an employee is discriminated against for exercising those rights.[3] *See* 29 U.S.C.

---

**2.** The FMLA's legislative history reveals that it "is based on the same principle as the child labor laws, the minimum wage, Social Security, the safety and health laws, the pension and welfare benefit laws, and other labor laws that establish minimum standards for employment." S.Rep. No. 3, 103d Cong., 1st Sess. 4 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 6–7.

**3.** "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this

subchapter." 29 U.S.C. § 2615(a)(1). "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

For example, if an employer denies an eligible employee the same or similar employment upon returning from FMLA leave, the employer violates the Act. *See* 29 C.F.R. § 825.220(b) (1997) ("Any violations of the Act or of these regulations constitute interfering with, restraining, or denying the exercise of rights provided by the Act.").

§ 2615(a)(1) & (2); 29 C.F.R. § 825.220 (1997). In particular, "[a]n employer is prohibited from discriminating against employees ... who have used FMLA leave."[4] 29 C.F.R. § 825.220(c). Nor may employers "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). For any such violation, the employer is subject to a claim for compensatory damages and, unless the court finds the violation occurred in good faith, additional liquidated damages. 29 U.S.C. § 2617(a)(1)(A). These provisions are essentially proscriptive.

■■■ It is this proscriptive group of violations of the Act that is at issue in the present case.[5] Hodgens claims that his termination violated the FMLA because it was prompted by the fact that he took sick leave to which he was entitled under the statute. In such a case, the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason. Such issues are analogous to those raised in cases involving other types of discrimination, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e through 2000e–17. In such cases, courts have created a framework for analyzing the tricky issue of motivation. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (discrimination under Title VII); *De-Novellis,* 124 F.3d at 308 (under ADEA);

*Katz v. City Metal Co.,* 87 F.3d 26, 30 n. 2 (1st Cir.1996) (under ADA). Some of our sister circuit courts have applied this framework to the proscriptive portion of the FMLA, but not to claims under the prescriptive portion of the Act. *See, e.g., Diaz,* 131 F.3d at 712–13; *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997). We follow that lead and hold that, when there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights.

■■■ *McDonnell Douglas* allocates the burdens of production and persuasion in accordance with a three-step procedure. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817. Under that framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If he does so, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. The employer "must clearly set forth, through the introduction of admissible evi-

The Act is also violated if the employer "interferes with" the employee's exercise of any other FMLA rights. *Id.*

**4.** The statute itself does not explicitly make it unlawful to discharge or discriminate against an employee for exercising her rights under the Act (such as placing an employee in a less desirable job because she took medical leave for a serious health condition). Nevertheless, the Act was clearly intended to provide such protection. The Department of Labor regulations implementing the FMLA interpret the Act this way, *see* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave."), and those regulations are entitled to deference, *see Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Such protection can be read into § 2615(a)(1): to discriminate against an employee for exercising his rights under the Act would constitute an "interfer[ence] with" and a "restrain[t]" of his exercise of those rights. *See* 29 C.F.R. § 825.220(b) (1997) (Interfering with the exercise of FMLA rights "would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.")

**5.** For example, Hodgens has not alleged that GD denied him any necessary medical leave, or that it refused to reinstate him after he returned from such leave. Nor does General Dynamics dispute that Hodgens is an eligible employee and that General Dynamics is a covered employer under the provisions of the FMLA. *See* 29 U.S.C. § 2611(2) & (4).

dence, the reasons for the [employee's termination]. The explanation provided must be legally sufficient to justify a judgment for the [employer]." *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089. If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave. *McDonnell Douglas,* at 804, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 257, 101 S.Ct. 1089; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). While a satisfactory evidentiary explanation by the employer for its actions destroys the legally mandatory inference of discrimination arising from the employee's prima facie case, the evidence and inferences that properly can be drawn from the evidence presented during the employee's prima facie case may be considered in determining whether the employer's explanation is pretextual. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742; *see also infra* at 168–69 (discussing various ways in which the employee might meet his burden of demonstrating pretext).

 To make out a prima facie case of retaliation, Hodgens must show that (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action. *See Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997); *Hilti, Inc.,* 108 F.3d at 1324.

### III

We will follow *McDonnell Douglas*'s three-step process in analyzing Hodgens's claim—that his termination violated the FMLA because it was prompted by the fact that he took sick leave to which he was entitled under the statute. The first step in our analysis is to determine whether Hod-

gens has satisfied all three elements of his prima facie case. There is no dispute as to the second element: his termination was an adverse action. General Dynamics disputes the first and third elements of Hodgens's prima facie case.

### A

General Dynamics asserts that Hodgens has failed to satisfy the first element of his prima facie case. It contends that his absences were not protected by the FMLA for two alternative reasons.

### 1

 First, according to GD, Hodgens was not even entitled to medical leave under the FMLA because he did not suffer from a "serious health condition" as the statute requires. The district court granted summary judgment to General Dynamics largely on this basis. For the reasons set forth below, we hold that Hodgens did suffer from a "serious health condition" within the meaning of the FMLA.

The FMLA entitles an employee to twelve workweeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The Act defines a "serious health condition" as

an illness, injury, impairment, or physical or mental condition that involves:

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

(B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11). Hodgens does not argue that he received any inpatient care for his condition; thus, § 2611(11)(A) does not apply. He does, however, contend that his visits to Dr. Wilkinson constituted "continuing treatment by a health care provider."

 Under the applicable Department of Labor regulations,[6]

---

6. Pursuant to his statutory authority, 29 U.S.C. § 2654, the Secretary of Labor promulgated final regulations implementing the FMLA, 29 U.S.C. § 825.100 et seq. (1997), which became effective

on April 6, 1995, 60 Fed.Reg. 2180, 2181 (Jan. 6, 1995). Because Hodgens's health-related leave and subsequent termination from employment occurred in 1993 and 1994, however, the final

§ 825.114 (a) For purposes of FMLA, "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves:

. . .[7]

(2) Any period of incapacity requiring absence from work, school, or other regular daily activities, of more than three calendar days,[8] that also involves continuing treatment by (or under the supervision of) a health care provider; or

(3) Continuing treatment by (or under the supervision of) a health care provider for a chronic or long-term health condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days; or for prenatal care.

(b) "Continuing treatment by a health care provider" means one or more of the following:

(1) The employee or family member in question is treated two or more times for the injury or illness by a health care provider.

Normally this would require visits to the health care provider or to a nurse or physician's assistant under direct supervision of the health care provider.

(2) The employee or family member is treated for the injury or illness two or more times by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider, or is treated for the injury or illness by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider—for example, a course of medication or therapy—to resolve the health condition.

(3) The employee or family member is under the continuing supervision of, but not necessarily being actively treated by, a health care provider due to a serious long-term or chronic condition or disability which cannot be cured. Examples include persons with Alzheimer's, persons who have suffered a severe stroke, or persons in the terminal stages of a disease who may not be receiving active medical treatment.

29 C.F.R. § 825.114(a) & (b) (1993).

Hodgens suffered from numerous symptoms in July and August 1993. Dr. Wilkinson examined him and, concerned about angina and its serious implications, ordered a series of tests directed toward diagnosing the cause and nature of his problem, with a view toward prescribing treatment (which she eventually did, although she never was able to rule out angina). Then between September 22 and 27, Hodgens was diagnosed with atrial fibrillation, and again was required to make many visits to Dr. Wilkinson's office. This latter period constituted more than three consecutive days' worth of absences from work for a serious health condition. And these absences were medically neces-

---

regulations do not apply here, and the Secretary's interim regulations govern this dispute. *See* 29 C.F.R. § 825.100 *et seq.* (1993).

We note that the district court in this case appears to have applied the final regulations, which are similar to, but not identical with, the applicable interim regulations. But this error need not detain us. The Third Circuit in *Victorelli v. Shadyside Hosp.*, 128 F.3d 184 (3d Cir. 1997), compared the interim and the final rules, as pertinent here, and concluded that "the standard for 'continuing treatment' has remained unchanged." 128 F.3d at 189. We agree. The final regulation " 'retains the concept that continuing treatment includes either two visits to a health care provider or one visit followed by continuing treatment by [or] under the supervision of a health care provider.' " *Id.* (quoting 60 Fed.Reg. 2180, 2195 (Jan. 6, 1995)). We will analyze the interim rules which are applicable here, but because the analogous final rules are essentially the same, we hope our analysis will eliminate the need for further litigation raising the same issues regarding the corresponding final rules.

**7.** Subsection 114(a)(1), dealing with inpatient care, is not applicable here.

**8.** The major difference between the interim and the final regulations is that the latter explicitly require more than three *consecutive* days of medically required absence from work. *See* 29 C.F.R. § 825.114(a)(2)(i) (1997). It is arguable that we should read the word "consecutive" into the interim regulations as well. We will analyze the present case as if more than three consecutive days' absence were required; we need not decide the question definitively because, as discussed *infra*, Hodgens satisfies the time requirement regardless of whether the absences must be consecutive.

sary: Hodgens's treating physician, Dr. Wilkinson, filled out a work-restriction form—at the top of which appeared the date September 22—stating September 27 as the date on which Hodgens could return to work. Dr. Wilkinson's form carries the inference that that entire period of absence was medically necessary, and GD nowhere rebuts that inference. Indeed, on September 21, GD's own nurse refused to let Hodgens return to work at least in part because of his atrial fibrillation. Thus, we cannot accept GD's claim, based on Dr. Wilkinson's initially clearing Hodgens to return to work on September 20, that Hodgens's health condition did not prevent him from working within the meaning of the FMLA during the period September 22–27.

At least the September 22–27 diagnosis and treatment program met the three day requirement of 29 C.F.R. § 825.114(a)(2) (1993), as long as there was continuing treatment under § 825.114(b). Hodgens clearly satisfied the requirements of § 825.114(b)(1), at least sufficient to satisfy summary judgment, because he had two or more treatments by a health care provider. He also fits within § 825.114(b)(2) because he had seen a physician at least once and been placed on a treatment regimen of medication. *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 335 (5th Cir.1997).

■ General Dynamics argues that many of Hodgens's earlier absences were not covered by the FMLA because "Dr. Wilkinson was never able to diagnose precisely what caused [Hodgens's] symptoms." Def. Br. at 22. It seems unlikely that Congress intended to punish people who are unlucky enough to develop new diseases, or to suffer serious symptoms for some period of time before the medical profession is able to diagnose the cause of the problem. Indeed, one reason for taking "intermittent leave" under the FMLA would be to visit the doctor for purposes of diagnosis and treatment, even if the employee does not take leave for the periods in between such visits. It would seem that Congress intended to include visits to a doctor when the employee has symptoms that are eventually diagnosed as constituting a serious health condition, even if, at the time

of the initial medical appointments, the illness has not yet been diagnosed nor its degree of seriousness determined. The Labor Department's final regulations support this interpretation: "Treatment for purposes of paragraph (a) of this section [defining 'serious health condition' in terms of 'treatment' received, inter alia] includes (but is not limited to) examinations *to determine if a serious health condition exists* and evaluations of the condition." 29 C.F.R. § 825.114(b) (1997) (emphasis added). Thus, as long as Hodgens satisfied, at some point in time, the "more than three consecutive days" requirement for establishing a serious health condition, his intermittent absences for less than four days (even for portions of one day) were protected under the FMLA if they were necessary "to determine if a serious health condition exists," *id.*, or to treat such a condition. This is true even if the intermittent absences occurred before the consecutive absences.

In addition to § 825.114(a)(2), Hodgens fits within § 825.114(a)(3). If not treated, Hodgens's illness could have led to a lot more absences from work, or could even have proved fatal, thus bringing him within the ambit of § 825.114(a)(3). Subsection (a)(3) also requires him to meet the definition of continuing treatment under one of the subsections of § 825.114(b). As noted *supra*, he clearly satisfied the requirements of subsections (b)(1) and (b)(2), at least sufficient to survive summary judgment. With all inferences taken in his favor, the issue is trialworthy, i.e., a trier of fact *could* find that he met all statutory requirements to show that he did suffer from a "serious health condition," and so his medically necessary leave was protected by the FMLA to the extent it was necessitated by that condition.

### 2

■ The district court's alternative reason for rejecting Hodgens's FMLA claim is that "there is no evidence that [his health] condition rendered him unable to perform the functions of his position," as required in 29 U.S.C. § 2612(a)(1)(D). The court therefore concluded that his absences were not protected conduct under the FMLA. We re-

ject this contention as well. The court apparently read the statute to require Hodgens to be actually incapacitated, in the sense of medically too sick to work, for any absence that was to be protected by the FMLA.

We disagree. The statutory language—"unable to perform" his job—in 29 U.S.C. § 2612(a)(1)(D) does not necessarily mean that an employee's physical condition itself "actually incapacitate[s]" him and prevents him from working. The statute could also be read to protect absences from work for whatever time the employee needs in order to be diagnosed and treated for a serious medical condition. Under this reading of the statutory language, the employee may be found to be "unable to perform" his job if his medical appointments conflict with his work (and the other statutory requirements are met), even if he is not "too sick to work." The text of the statute does not specify which of these two interpretations of "unable to perform" (or any other) was intended by Congress.

In determining which interpretation to adopt, we must consider the fact that the FMLA is a remedial statute. *Cf. Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 861 (1st Cir.1998) (interpreting the Americans with Disabilities Act). "It is a 'familiar canon of statutory construction that remedial legislation,' " such as the FMLA, "should be construed broadly to effectuate its purposes.' " *Id.* (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)). The fundamental purpose of the FMLA is "to entitle employees to take reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(2), "to help working men and women balance the conflicting demands of work and personal life," *City of Fort Wayne*, 117 F.3d at 1024. This purpose is better served by adopting the broader reading than by adopting the district court's more constrained construction requiring physical incapacitation. We hold that it will suffice if an employee is "unable to perform" his job because of the need to obtain medical treatment or a diagnosis; he does not have to be physically unable to work.

The legislative history of the FMLA supports this reading.

The requirement that the employee be unable to perform his or her job functions does not mean in each instance that the employee must literally be *so physically and mentally incapacitated* that he or she is generally unable to work.... [I]f the employee must be physically absent from work from time to time in order to receive the treatment, it follows as a matter of common sense that the employee is, during the time of the treatments, temporarily "unable to perform the functions of his or her position" for purposes of [§ 2612(a)(1)(D) ] and therefore eligible for leave for the time necessary to receive the treatments.

S. Rep. No. 103–3, pt. 1, at 25 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 27 (emphasis added); *see id.* at 29, 1993 U.S.C.C.A.N. at 31 (noting the "general test that either the underlying health condition *or the treatment for it* requires that the employee be absent from work on a recurring basis or for more than a few days for *treatment or recovery* " (emphasis added)).

Our interpretation is further buttressed by the Department of Labor's final regulations.[9] The final version of 29 C.F.R. § 825.114(a) (1997), like the corresponding interim regulation, defines "serious health condition" as involving (1) inpatient care or (2) continuing treatment. Under the rubric of continuing treatment, the regulation describes "incapacity" as "inability to work ... due to the serious health condition, *treatment therefor*, or recovery therefrom." 29 C.F.R. § 825.114(a)(2)(i) (emphasis added). In a similar vein, 29 C.F.R. § 825.114(b) (1997) reads as follows: "Treatment for purposes of paragraph (a) of this section [defining 'serious health condition' in terms of 'treatment' received, inter alia] includes (but is not limited to) examinations *to determine if a serious health condition exists* and *evaluations* of the condition" (emphasis added). *See also* 29 C.F.R. § 825.115 (1997) ("An employee who must be absent from work to receive medical

---

**9.** Although the final regulations are not at issue here because they were not yet effective, we may be guided by them insofar as they shed light on our interpretation of the interim regulations. *See Victorelli*, 128 F.3d at 186.

treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment.").

It is thus apparent that the agency charged with interpreting the FMLA—and filling in any gaps or ambiguities in the Act—believed that the Act should be interpreted broadly enough to protect absences from work that are necessary for the purpose of having one's medical condition diagnosed and treated, such as those at issue here. The agency did not interpret the statutory language—that Hodgens's health condition render him "unable to perform" his work—as requiring him to be "too sick to work." The agency's interpretation is entitled to deference. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778. We hold that Hodgens's absences from work were protected by the FMLA if they were required for the diagnosis and treatment of his medical condition, as long as he satisfied the other requirements for "seriousness" [10]; it is not necessary that the medical condition make him "too sick to work" on a particular day in order for an absence on that day to be covered under the statute. We therefore reverse the district court's holding to the extent that it stated a contrary view. The FMLA protected Hodgens's absences whenever his health condition required him to visit his physician rendering him unable to work during the time it took to accomplish those visits.

We conclude that Hodgens would be entitled to survive summary judgment if a rational trier of fact *could* find that at least four consecutive days' worth of Hodgens's absences were medically necessary and therefore rendered him "unable to perform" his job, within the meaning of 29 U.S.C. § 2612(a)(1)(D), for those days. Because a rational juror could so find, we hold that at least some of his leave was covered by the FMLA. Therefore the district court erred to the extent that it predicated its grant of summary judgment on the ground that there was *no* FMLA-qualifying leave at issue.

**B**

Thus far, we have found that, at the summary judgment stage, Hodgens has satisfied the first element of his prima facie case, by availing himself of a protected right under the FMLA, because at least some of the leave Hodgens took during 1993 and 1994 was FMLA-related. Nevertheless, GD argues that most of Hodgens's absences were not in fact protected leave under the FMLA, and that, it was these *non*-FMLA absences that motivated it to evaluate Hodgens unfavorably, plus the quality of his performance relative to his peers.

This argument goes to the third element of Hodgens's prima facie case: whether he has made a sufficient showing of a causal connection between his taking FMLA-protected leave and GD's decision to include him in its RIF and therefore to terminate his employment.

GD admits that Hodgens's supervisor warned him that he was taking "too much time off," and that this warning came shortly after Hodgens had taken several days off for ear surgery. GD also concedes that its evaluation of Hodgens one month later advised him to "make every effort to have [his] absenteeism fall within company guidelines." Additionally, during its April 1994 RIF, GD decided which employees to lay off based on a ranking that considered Hodgens's absentee rate, as well as his performance during prior time periods and that performance was diminished in part due to Hodgens's absences, some of which were FMLA-protected visits to Dr. Wilkinson regarding his heart condition. This is sufficient to make out a prima facie case that Hodgens's absences were at least one factor in his low performance evaluation and hence in his dismissal.

The prima facie burden is "quite easy to meet." *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.1991); *see Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Therefore, for purposes of this summary judgment motion—where all inferences are drawn in Hodgens's favor—and in light of the relatively

**10.** For example, when the need to obtain treatment and diagnosis is foreseeable, the employee must provide adequate notice and make a "rea-sonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer." 29 U.S.C. § 2612(e)(2).

low threshold showing necessary to establish a prima facie case, we conclude that Hodgens has satisfied his burden as to the third element (causal connection), as well as the other elements of his prima facie case.

## IV

Having disposed of the challenge to the first step of the *McDonnell Douglas* analysis (Hodgens's prima facie case), we turn now to the remaining steps: whether General Dynamics articulated a legitimate nondiscriminatory reason for terminating Hodgens's employment, and, if so, whether Hodgens has demonstrated, at least to the level of trial-worthiness, that the reason was a pretext, and that he was, in reality, discharged discriminatorily on the basis of his having availed himself of a right protected by the Act, namely, the right to take medically necessary leave time. We conclude that Hodgens failed to demonstrate that a reasonable trier of fact could find his inclusion in the RIF to be based on his having taken FMLA leave.

### A

Even though Hodgens has established a prima facie case of retaliation, General Dynamics has articulated a legitimate nondiscriminatory reason for terminating him.

GD stated that Hodgens was transferred out of program planning and eventually to Module 82 for legitimate business reasons, including a realignment of staff that resulted from earlier RIFs, i.e., from RIFs that preceded Hodgens's taking any FMLA-related medical leave. GD has shown that its April 1994 RIF was legitimate and economically necessary. And GD has submitted evidence that Hodgens's performance in Module 82 was below par, in any event significantly lower than the performance of all similarly situated Module 82 workers (project managers).[11] For present purposes, GD has sufficiently articulated a legitimate reason for its adverse actions against Hodgens.

### B

■ Hodgens cannot and does not claim that an employer cannot transfer employees from one department to another or reduce the overall size of its staff if there is a legitimate business reason to do so. The FMLA certainly does not prevent such transfers or RIFs. An employer is entitled to reduce and/or reorganize its staff; efficiency is a legitimate goal. But an employer may not use its RIF/reorganization/improved-efficiency rationale as a pretext to mask actual discrimination or retaliation; the mere incantation of the mantra of "efficiency" is not a talisman insulating an employer from liability for invidious discrimination. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817 (employer may not use an ostensibly legitimate reason for an adverse action as a pretext for discrimination that is prohibited by statute); 29 U.S.C. § 2615(a); 29 C.F.R. § 825.220; *cf. INS v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983): "Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." Nor are they the objectives of public policy underlying statutes like the FMLA or the ADA.

### 1

■ The competing considerations that underlie a pretext analysis are especially problematical in a case like Hodgens's. Under the *McDonnell Douglas* framework, in order to rebut the presumption that arises upon the establishment of a prima facie case, the employer need only produce enough competent evidence which, if taken as true, would permit a rational factfinder to conclude that the challenged employment action was taken for a "legitimate, nondiscriminatory reason," *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089; *accord Hicks*, 509 U.S. at 509, 113 S.Ct. 2742; *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir.1997). GD has accomplished this here by offering the testimony of its decision-making supervisors that GD dis-

---

11. Of course, to the extent that GD's evaluation of Hodgens's performance in 1993–94 included consideration of his FMLA-protected absences, this is not a legitimate reason for lowering his evaluation and laying him off. The effects of Hodgens's FMLA-related leave may not be held against him.

charged Hodgens because of his performance and his non-FMLA absences, and that its decision ignored his FMLA-protected absences.

At this point, Hodgens must demonstrate that there is a trialworthy issue of pretext. If we were to permit GD's mere assertion of a legitimate reason to discharge Hodgens to insulate it against liability, then this employer could circumvent the anti-discrimination provisions of the FMLA (and of other statutes) simply by making a unilateral decision to transfer the employee (Hodgens) to a new work station where he has low seniority and/or is unable to perform the new job as well as others who have been in that position for a longer time. That way, when a RIF occurs (another decision made solely by the employer), Hodgens, as a recent transferee, would be the low person on the totem pole, whether the order of termination proceeds based upon seniority in the position or upon the quality of performance to date. The decision as to what basis to use in deciding who gets RIFed is, of course, also a decision made unilaterally by the employer.

█ Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, and because of the difficulty of accurately determining whether an employer's motive is legitimate or is a pretext for discrimination, there is reason to be concerned about the possibility that an employer could manipulate its decisions to purge employees it wanted to eliminate. *See Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir.1990) (Subjective evaluations of performance "are more susceptible of abuse and more likely to mask pretext" than objective job qualifications.) (internal quotation marks omitted). The law does not permit this. Even if an employer's actions and articulated reasons are facially neutral (e.g., a RIF), if in reality the employer acted for a prohibited reason (e.g., retaliation for exercising a protected right), then its asserted legitimate reason for the RIF and its ostensibly nondiscriminatory selection criteria as to who gets RIFed cannot insulate it from liability. As Judge Posner wrote in the context of ADA disability discrimination, "[a] RIF is not an open sesame to discrimination

against a disabled person. Even if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of its disabled workers." *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195 (7th Cir.1997) (citation omitted). Nor can it be an opportunity to get rid of workers who exercise their FMLA right to take medical leave for serious medical conditions. *See* 29 U.S.C. § 2615(a).

█ This means that, where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be "particularly cautious" about granting the employer's motion for summary judgment. *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir.1983). Of course, summary judgment is not "'automatically preclude[d]'" even in cases where elusive concepts such as motive or intent are at issue. *See DeNovellis,* 124 F.3d at 306 (quoting *Valles Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984)). "[I]f the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," summary judgment may be appropriate even where intent is an issue. *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 12 (1st Cir.1994) (internal quotation marks omitted). Where, however, the nonmoving party has produced more than that, trial courts "should 'use restraint in granting summary judgment' where discriminatory animus is in issue." *DeNovellis,* 124 F.3d at 306 (quoting *Valles Velazquez,* 736 F.2d at 833); *see Stepanischen,* 722 F.2d at 928. The role of the trial judge at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

We recognize that courts in other circuits have addressed similar FMLA claims and, "[g]ranting [the] plaintiff the benefit of every favorable inference," have concluded that "the pattern of actions taken by [the] defen-

dant precludes summary judgment concerning [the] defendant's motivation." *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324, 329 (10th Cir.), *cert. denied,* 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996) (finding a genuine issue of fact concerning retaliatory intent when the pattern of conduct began soon after the filing of a charge and later culminated in actual discharge); *see Monica v. Nalco Chemical Co.,* No. CIV.A. 96–1286, 1996 WL 736946, at *2 (E.D.La.1996) (The fact that one of six absences that employer used as a basis for terminating plaintiff for excessive absenteeism was an FMLA-covered absence creates genuine issue of material fact that his discharge was in retaliation for the FMLA-covered leave.); *cf. Victorelli,* 128 F.3d at 187–88 (finding material issue of fact as to whether plaintiff suffered from a serious health condition); *City of Fort Wayne,* 117 F.3d 1022, 1027 (7th Cir.1997) (same); *Rhoads v. FDIC,* 956 F.Supp. 1239, 1256 (D.Md.1997) (same). And we have held likewise, in analogous contexts. For example, in *Wynne v. Tufts Univ. Sch. of Med.,* 932 F.2d 19, 27–28 (1st Cir.1991) (en banc), we held that the record did not contain a sufficient showing on the movant's part to permit judgment as a matter of law. We determined that the movant (university) had to demonstrate that its decision to dismiss the plaintiff (student) "was a reasoned, professional ... judgment, not a mere ipse dixit." *Id.* at 27. As a result, we "set aside the summary judgment and remand[ed] th[e] issue for further proceedings." *Id.* at 28; *see Rossy v. Roche Prods.,* 880 F.2d 621, 626 (1st Cir.1989) ("All of [the employer's] explanations may in fact be accurate, but they must be decided after trial, especially in cases such as this where [the employer's] intent is the central issue."). In those cases, the courts have left it to the trier of fact to assess whether the evidence supported the legitimacy of the employer's stated reason or the employee's allegation of pretext.

Of course, those decisions, like all decisions to affirm or reverse grants of summary judgment, were fact-based. In each case, the issue was a factual question of motivation: could a reasonable jury find that the adverse action was taken because of the employee's protected conduct rather than because of other nondiscriminatory reasons?

■ The nonmoving plaintiff may demonstrate pretext either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason. *See Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. Thus, one way an employee may succeed is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and [with or without additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons." *Hilti, Inc.,* 108 F.3d at 1323 (internal quotation marks omitted); *Weldon,* 896 F.2d at 798 (courts should be sensitive to myriad of ways such an inference can be created).

■ In addition, close temporal proximity between two events may give rise to an inference of causal connection. Thus, "protected conduct closely followed by adverse action may justify an inference of retaliatory motive." *Marx,* 76 F.3d at 329; *see Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 110 (1st Cir.1988) ("A showing of discharge soon after the employee engages in an activity specifically protected by ... Title VII ... is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation."); *Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir. 1986) (finding retaliatory pretext based, inter alia, upon employer's having discharged employee less than one month after her filing a discrimination charge); *cf. Hilti, Inc.,* 108 F.3d at 1325 ("Morgan has established a prima facie case of FMLA retaliation, in that Hilti sent her a letter of discipline concerning attendance problems on the day she returned from the leave.").

■ In assessing discriminatory motive, a court may also consider other factors, including "among other things, 'the historical background of the ... decision'; '[t]he spe-

cific sequence of events leading up to the challenged decision'; '[d]epartures from the normal procedural sequence'; ... '[any] contemporary statements by members of the decisionmaking body,' " *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, ——, 117 S.Ct. 1491, 1503, 137 L.Ed.2d 730 (1997) (quoting *Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 267–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (alterations in *Reno* )); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1221 (2d Cir.1987), and "[s]ubstantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," *Arlington Heights*, 429 U.S. at 267–68, 97 S.Ct. 555; *Yonkers Bd. of Educ.*, 837 F.2d at 1221. In addition, "doubts about the fairness" of an employer's decision or an employer's " 'misjudg[ing]' " of an employee's qualifications, while not necessarily dispositive, " 'may be probative of whether the employer's reasons are pretexts for discrimination.' " *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir.1992) (quoting *Burdine*, 450 U.S. at 259, 101 S.Ct. 1089).

2

■ Applying these principles, we must determine whether there is sufficient evidence favoring Hodgens for "a fair-minded jury [to] return a verdict in his favor," *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, i.e., for a jury to conclude that Hodgens's discharge was motivated by retaliation for his having availed himself of a right protected by the FMLA, namely, the right to take medically necessary leave time. We have already examined, in a different context, GD's stated reasons for discharging Hodgens. In Part III(B), *supra*, we determined that Hodgens had produced sufficient evidence to satisfy the low threshold required to meet the third prong of his prima facie case, i.e., that there was a causal connection between his protected medical leave and his losing his job. Because GD has met Hodgens's prima facie case by articulating its facially nondiscriminatory reasons for terminating him, we must now examine whether

Hodgens has produced sufficient evidence for a rational jury to conclude that those reasons were a pretext for discrimination.

Based on the record here, a rational jury could not reach such a conclusion. It is undisputed that a number of Hodgens's problems on the job took place long before he took his first medical leave. For example, in 1985, in a previous RIF, GD closed down Hodgens's prior work site in Quincy altogether. Hodgens was out of work for three years as a result. After he was re-hired at the Quonset Point facility and doing well for three years, the program planning function in which he was excelling was eliminated in 1991, resulting in his reassignment to production control. This was still two years before the onset of the medical conditions at issue in the present case, June 1993. For the year beginning March 1, 1991, Hodgens's performance was ranked eighth out of ten employees in his peer group, and the two employees who ranked behind him were laid off that year as part of another RIF. In the year beginning March 1, 1992, Hodgens ranked seventh of eleven in his rank group. Hodgens's poor performance in the two years preceding his illness was a source of great concern to him, particularly as it related to the possibility that he might become the next casualty of GD's efficiency-related RIFs.

Shortly before the first relevant manifestation of his heart problems, Hodgens was reassigned to work in Module 82, where his performance problems became even worse. He worked on Module 82 between April and early August 1993. Thus, even without parsing the competing evidence as to which portions of Hodgens's poor performance on Module 82 were related or unrelated to the absences caused by his HBP and his potential heart condition, we note that all of the foregoing events—putting Hodgens in an extremely unfavorable position at work—occurred prior to his taking any FMLA-protected medical leave. This is obvious with respect to the period prior to his being assigned to Module 82; and it also applies to his poor performance in Module 82 between April and August 1993, which preceded his

FMLA-protected leave.[12] So none of these events could have been motivated by Hodgens's having taken FMLA-protected leave.

Further, Hodgens failed to submit any evidence, direct or circumstantial, that General Dynamics's well-justified and documented decision to lay off more workers in April 1994 was a mere pretext for retaliation against Hodgens for exercising his right to take medical leave. On the contrary, the RIF itself seems real enough and the legitimate business need for it remains unshaken. There were RIFs before Hodgens became ill, and there is no evidence that there was anything pretextual about GD's general business strategy of reducing its work force in order to maintain its profit levels.

Nevertheless, while the RIF as a whole appears legitimate, there remains the question of whether GD's selection of Hodgens in particular to be laid off was based in any way upon his having exercised his FMLA right to take necessary medical leave. GD presented evidence that Hodgens's ranking for the year beginning March 1, 1993 (including the period of his Module 82 position as well as the period of his FMLA-protected absences, plus less than one month in the machine shop to which he half-heartedly argues he would not have been assigned if he had not taken FMLA leave) was based on a comparison with those senior planners having similar duties, and that he ranked lowest among his peers in terms of performance. Hodgens himself told his doctor that he was experiencing pressure at work because of a "decrease in performance because of inexperience in [his] present job."

In order to overcome the weight of these facts, Hodgens offered the following evidence to dispute the legitimacy of GD's rationale for including him in the layoff, i.e., to show that it was a mere pretext: (1) shortly after he returned from a significant amount of FMLA-protected medical leave, his supervisor told him he should do something to reduce his "excessive absences"; (2) his evaluation contained the statement, "Make every effort to have your absenteeism fall within the company guidelines"; (3) his termination was based on the low performance evaluation which he received shortly after returning from his protected medical leave, and this temporal proximity bespeaks a retaliatory intent; and (4) a memorandum, entitled "Justification Regarding Drop in Rank Position," specifically acknowledged that his absentee rate was a factor in his low performance rating and therefore in his termination. Thus, in the language of *Arlington Heights*, Hodgens contends that the "specific sequence of events" leading up to his termination, coupled with the contemporary statements by his supervisor (written and oral) warning him about his "excessive absences," constitute proof that GD's decision to terminate him was motivated by his having availed himself of FMLA-protected medical leave. *Arlington Heights*, 429 U.S. at 267–68, 97 S.Ct. 555. We will discuss these facts seriatim although, in evaluating their sufficiency to withstand summary judgment, we must consider them in combination, not each standing alone.

As noted *supra*, close temporal proximity between two events may give rise to an inference of causal connection. Therefore, "it may be significant that [Hodgens's termination, and the warning that preceded it, occurred] shortly after his having taken FMLA leave." *Williams v. Shenango, Inc.*, 986 F.Supp. 309, 322 (W.D.Pa.1997) (denying summary judgment to employer because a reasonable factfinder could find employer's articulated reasons for suspending and terminating employee to be pretexts for discrimination based on having taken FMLA leave); *see Marx*, 76 F.3d at 329 (same).

While Hodgens is correct that temporal proximity *may* give rise to a "suggest[ion] of retaliation," *Oliver*, 846 F.2d at 110, that "suggest[ion]" is not necessarily conclusive. We must remember that it is the employee's burden to show pretext, sufficient to survive summary judgment. This is a question of fact, the resolution of which is usually left to the trier of fact.

---

12. Indeed, Hodgens's physician, Dr. Wilkinson, thought that at least some of Hodgens's medical problems stemmed from his great anxiety over his unsatisfactory performance in his new job at Module 82, and his fear that his performance might result in his losing his job due to a RIF.

Here, the circumstantial fact of temporal proximity is weakened considerably by the history of GD's prior non-discriminatory RIFs and of Hodgens's poor work performance. To strengthen his case, Hodgens has produced evidence that his supervisor specifically referred to his "excessive absences" and his termination was based on an evaluation and justification memo reflecting the same concern. According to Hodgens, these contemporaneous statements by the decision-making authority (or its agent) demonstrate persuasively that GD's decision to rank him at the bottom of his peer group and to choose him as the employee from that group to lay off in the 1994 RIF were motivated by retaliatory animus. The inference is strengthened by the fact that Hodgens had a good work history for three of the five years since he was rehired by GD at Quonset Point and for twenty years previously in Quincy. On the other hand, the inference is weakened by his performance problems over the two years prior to his taking FMLA-protected medical leave, although it must be remembered that Hodgens survived the earlier RIFs, even if only by the skin of his teeth.

 Statements by supervisors carrying the inference that the supervisor harbored animus against protected classes of people or conduct are clearly probative of pretext, *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 347–48 (1st Cir.1998) (Remark that it would be a good time "to get rid of some of the older mediocre managers" had a "direct bearing on age discrimination."); *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 746 (7th Cir.1994) (Comment by supervisor that the plaintiff's "accounts could use some younger blood" constituted sufficient direct evidence of discriminatory intent.); *Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir.1991) (Sexist comments reflecting the supervisor's stereotypical images of men and women raised a

genuine issue of fact with respect to pretext.); *Morgan v. Arkansas Gazette*, 897 F.2d 945, 951 (8th Cir.1990) (City circulation manager's statements that the plaintiff was "an old fuddy-duddy" constituted direct evidence that the defendant's reason for discharging the plaintiff was a pretext for age discrimination.), even if that inference is not the only one that could be drawn from the comment, *Binder v. Long Island Lighting Co.*, 933 F.2d 187, 192–93 (2d Cir.1991) (Statement that plaintiff was overqualified for position raised an issue of material fact with regard to pretext in an age discrimination case.).

GD argues that the statements by Hodgens's supervisor are not as damning as Hodgens would have us believe: they refer only to his "excessive absences," and GD has offered evidence that a great many of Hodgens's absences were not FMLA-protected. *Cf. Hilti, Inc.*, 108 F.3d at 1322, 1324–25 (finding no genuine issue regarding pretext where employee had a long history of excessive absenteeism over the years, about which she had received several warnings well before she took any FMLA-protected leave). According to GD, the supervisor was primarily referring to non-protected absences, rendering these statements a great deal less than a "smoking gun."[13]

Hodgens disputes the merits of GD's attempt to parse his absences into FMLA-protected and non-FMLA-protected. He argues that it was not unreasonable for him to remain absent from work for medical reasons during the entire period that he did, because during this time his physician performed diagnostic tests in an effort to determine how serious his medical condition was and, if indeed it was heart-related, whether it would be safe for him to return to work before it was brought under control. Dr. Wilkinson was "most concerned" that his symptoms and

---

13. "Smoking gun" evidence is, of course, not required in order to prove discrimination. *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 635 (1st Cir.) ("[O]ur cases establish that a plaintiff need not and should not be required to produce smoking gun evidence before prevailing in a discrimination suit.") (footnote and internal quotation marks omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 2457, 138 L.Ed.2d 214 (1997). Such evidence is rarely found in today's sophisticated

employment world, *United States Postal Serv. Bd. of Gov. v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."); *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 273, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring), so discriminatory motive is more often demonstrated through indirect evidence under the *McDonnell Douglas* framework.

history could indicate that he was suffering from angina, which she was never able to rule out during the entire period of nearly two months that Hodgens was out of work. If he was suffering from angina, then any stress, including work, would increase the chance that he could have a heart attack. Similarly, his atrial fibrillation, if not treated properly, could lead to a stroke.

The problem that Hodgens cannot overcome is that, while Dr. Wilkinson may indeed have been concerned about his condition, she did not tell him that his medical condition required him to stay home from work from August 4 through September 21, 1993. To the contrary, while she thought it was "reasonable" for Hodgens to want to stay home from work pending the outcome of his tests, she in fact recommended that he return to work despite his medical condition and its potential risks. As GD notes, Hodgens could, for example, have kept any given medical appointment in the morning, and then come back to work for the remainder of the day, which he did do on some occasions but not on others. Thus, apart from the period from September 22–27, while Hodgens's medical condition clearly did require him to be absent from work during the times necessary for his medical visits, it did not require the vast majority of his absences during August and September. The remainder of his absences between August 4 and September 21 as well as after September 27 were therefore not protected by the FMLA, i.e., the time that was not actually necessary for him to attend medical appointments related to his heart condition.[14] GD was not precluded from taking those unprotected absences into account in evaluating Hodgens's performance and in determining whether to include Hodgens in the RIF.

The question of summary judgment here is a close one because both GD and Hodgens have presented probative evidence tending to support their respective versions of the facts, on the question whether GD's reason for discharging Hodgens was legitimate or merely a pretext to retaliate against him for taking FMLA-protected medical leave. The weighing of such alternative factual scenarios would ordinarily be left to the finder of fact after trial. But on this record, the weight of the evidence does not "present[ ] a sufficient disagreement to require submission to a jury"; it is "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505. No rational factfinder could reasonably conclude that GD terminated Hodgens in retaliation for exercising his rights under the statute: the vast majority of Hodgens's absences were not FMLA-protected; overwhelming evidence demonstrated his poor performance, during two full years prior to his protected medical leave plus during the portion of the 1993–94 evaluation year that preceded his medical leave; and the evidence Hodgens offered was simply insufficient to outweigh the foregoing, such that a factfinder could infer pretext. Because "a fair-minded jury could [not] return a verdict for [Hodgens] on the evidence presented," *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, we affirm the grant of summary judgment on the FMLA claim.

## V

Hodgens also makes a claim under the ADA. We affirm the district court's grant of summary judgment on the ADA claim on the same basis that we affirm on the FMLA claim. Hodgens never demonstrated, to the level of sufficiency required on a motion for summary judgment, that GD's stated reason for terminating him—a RIF based on his performance—was a pretext for his asserted disability. Hodgens has certainly not made any more persuasive a demonstration that his layoff was a pretext for discrimination based on his disability than he did to show that it was a pretext for retaliation based on his having taken FMLA leave.

Therefore, his ADA claim must fail, and the grant of summary judgment to General Dynamics must be affirmed, albeit on a different basis than that relied upon by the

---

**14.** Dr. Wilkinson restricted Hodgens to working half-days during the first week after he returned to work on September 27, and to working a light-duty schedule for the following three weeks. These absences and restrictions were protected by the FMLA and could not be considered by GD in making employment decisions about Hodgens.

district court. We will affirm a correct result reached by the court below "on any independently sufficient ground made manifest by the record." *Palmacci v. Umpierrez,* 121 F.3d 781, 792 (1st Cir.1997); *AIDS Action Comm. of Mass. v. MBTA,* 42 F.3d 1, 7 (1st Cir.1994) (internal quotation marks omitted). We need not decide whether the district court was correct in holding that certain of Hodgens's medical conditions (HBP and atrial fibrillation) did not constitute a disability within the meaning of the ADA, and in particular, whether deciding that issue should proceed with or without consideration of Hodgens's ameliorative medications. *See Arnold,* 136 F.3d 854.

The grant of summary judgment to General Dynamics is *Affirmed.* No costs to either party.