**Richard v. U.S. Postal Service**          **CV-00-436-B    08/21/02**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Roger R. Richard

    v.                                          Civil No. 00-436-B
                                                    Opinion No. 2002 DNH 157
United States Postal
Service et al.


MEMORANDUM AND ORDER


Roger Richard brings this action against the United States Postal Service ("USPS") and the following individuals in their official capacities: John E. Potter, Postmaster General; Joseph Collins, Postmaster of the Manchester, New Hampshire, Post Office; Patricia Deschaines, former Station Manager at the Manchester Post Office's South Station; Katherine Dircks (formerly Holopitza), Station Manager at South Station; and Hugh Eugene Mann, a supervisor at South Station.[1]  Richard claims that

---

[1] It appears that the only proper defendant in this case is Potter, the Postmaster General.  See 42 U.S.C. § 2000e-16(c); Soto v. U.S. Postal Service, 905 F.2d 537, 539 (1st Cir. 1990) ("In cases brought against the Postal Service, the Postmaster General is the only properly named defendant.  A district court should dismiss claims brought against all other defendants, including the U.S. Postal Service and the local postmaster."); Meyer v. Runyon, 869 F. Supp. 70, 76 (D. Mass. 1994) (explaining that under Title VII and Rehabilitation Act, which incorporates remedies and procedures of Title VII, head of an agency is the

the defendants engaged in unlawful employment discrimination based upon his disability and gender, and also retaliated against him after he formally complained. Specifically, he alleges discrimination in violation of the Rehabilitation Act, 29 U.S.C. §§ 701 et seq. (Count I); retaliation (after filing an internal complaint) in violation of the Rehabilitation Act (Count II); retaliation (after filing a complaint in this court) in violation of the Rehabilitation Act (Count III); discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq. (Count IV); and retaliation in violation of Title VII of the Civil Rights Act (Count V). Currently before me is the defendants' motion for summary judgment.

## I. BACKGROUND[2]

While serving in the United States Army, Roger Richard underwent surgery on his left shoulder to correct a chronic

---

only proper defendant). Therefore, I intend to dismiss Richard's claims against all other defendants. Any objection should be filed with an accompanying memorandum within 10 days of this order.

[2] I construe the evidence in the light most favorable to Richard, the non-moving party, and draw all reasonable inferences in his favor. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001) (explaining the operation of Fed. R. Civ. P. 56) (citation omitted).

dislocation problem. The surgery caused ulnar nerve damage in his left shoulder, arm and hand. As a result, Richard has a limited range of motion in his left arm and experiences pain when he moves it beyond its limits. He cannot raise his arm over his head, and thus has difficulty getting dressed; he cannot bathe some parts of his body without assistance; and he cannot do household work that requires reaching, pushing or pulling with his left arm. Richard has never been able to pick up his children and cannot engage in recreational sports that require the full use of both arms.

Richard completed his service with the army in May 1985. Upon discharge, the Veterans Administration gave him an impairment rating of 30% due to his ulnar nerve damage. Richard subsequently applied for and accepted a position as a city letter carrier with the USPS, which afforded him hiring preference as a disabled veteran. Like all new carriers, Richard began as a part-time employee who filled in on an as-needed basis. He eventually obtained a full-time position with a right to bid for a permanent route, among other benefits. Assignment of permanent routes in the USPS depends upon seniority. Richard worked on various routes in Manchester between 1985 and 1995. By 1995 he

had obtained enough seniority to bid successfully on Route 305, a "park and loop" route that required Richard to drive to one location, park his vehicle and deliver mail on foot to homes or businesses in a loop around the area where he had parked, then drive to a different location and repeat the process.[3]

Prior to 1995, Richard manually sorted all his mail before embarking on his route for the day through a process known as "casing." Casing involves placing standard sized envelopes ("letters") into a desk fitted with shelves and slots and then repeating the process with circulars, magazines and other items larger than a business or personal letter ("flats"). Richard was able to avoid extensive use of his left arm both when casing and delivering the mail. He carried letters in his left hand and flats in a bag on his right shoulder. At each address, he reached first into his bag to pull out the flats and then removed the letters from his left hand with his right hand. He then placed the mail in boxes or slots with his right hand.

In 1995, the Manchester Post Office adopted an automated

---

[3] The USPS also has "mounted" routes, where the carrier stays in a vehicle and drives from mailbox to mailbox, and "curbline/dismount" routes, where the carrier drives to an address, exits his vehicle to deliver the mail and then drives to the next address.

system for mail sorting known as "Delivery Point Sequencing" ("DPS").[4] While this system eliminated the need for carriers to case most letters, they still needed to hand sort flats and "residual" letters that the automated system was unable to sort. After introducing DPS, the USPS mandated that carriers carry two bundles of letters in one hand - DPS (automatically sorted) letters and residual (manually sorted) letters. After DPS was implemented, Richard had to twist his left hand to determine whether letters from one or both bundles needed to be delivered to each address on his route. He also had to engage in more leaning and reaching to prepare mail for delivery. The increased strain on Richard's left shoulder, arm and hand caused him to complain to his supervisor about the DPS system.

Richard produced a medical report and note from the Manchester Veterans Administration hospital ("VA") dated September 13, 1995 that confirmed his disability and suggested that he be allowed to case his DPS mail as an accommodation. In response, the Post Office required Richard to undergo a "fitness for duty" medical examination by a physician it selected. The

---

[4] DPS is a nationwide system, introduced as a cost saving measure because it reduced the amount of time carriers must spend in the office sorting mail.

physician, Dr. John Barlley, completed a report, finding Richard medically qualified to perform his job, but recommending that Richard's job functions be "modified as needed to minimize discomfort." Postmaster Collins responded by advising Dr. Barlley that the USPS could not accommodate Richard by allowing him to case his DPS mail. This prompted Dr. Barlley to issue a second report in which he found that Richard was not medically qualified to perform the essential functions of his job.

In late September or early October, Richard was removed from Route 305 and was temporarily assigned to Route 177, a business route in Manchester that did not have any DPS mail. At the same time, Richard was told to file a "CA-2" form, indicating a work-related injury, to insure that he would not lose his job.

In November 1995, Richard bid successfully on Route 417, a "curbline/dismount" route consisting of residences and many large apartment buildings. Although the route required Richard to deliver DPS mail, his deliveries to the apartment buildings did not require him to carry two bundles of letters in one hand. Nevertheless, Richard was unable to complete his route in eight hours because neither the manually sorted nor the DPS mail for the apartment buildings was sorted into the proper mailbox

sequence. In an effort to allow Richard to complete the route in less time, his supervisor, Gene Mann, granted Richard's request in early 1997 to case all mail, including DPS mail. Both Mann and Richard were pleased with the increased efficiency that casing allowed.

Postmaster Collins observed Richard casing DPS mail for his route on February 20, 1998, and ordered him to stop. Shortly thereafter, Richard discovered that a female co-worker with a disability similar to Richard's had been permitted to case her DPS mail as an accommodation to her disability. This discovery prompted Richard to file a gender and disability complaint with the Post Office EEO Counselor on March 12, 1998. After Richard initiated his internal complaint, the USPS withdrew permission for the female co-worker to case mail.

On April 10, 1998, Richard was called into a meeting with union and management, where Mann criticized Richard's job performance by stating that he was too slow with Route 417, and that he had left his case 17-20 times in one day. When asked to be more specific, however, Mann could cite only four examples of Richard leaving his case, two of which were for a bathroom break and a trip to the water fountain. Station Manager Patricia

Deschaines also criticized Richard for reading his paycheck while "on the clock" and instructed him to obtain medical documentation for his disability.

On May 14, Richard filed a formal, written complaint of gender and disability discrimination with the EEO. A few days later, Postmaster Collins and Deschaines reassigned Richard from Route 417 to light-duty office work and ordered him to submit to an independent medical exam with Dr. James Forbes, an orthopaedic surgeon. Richard's office work often did not fill his entire day; throughout June and July, he asked permission to deliver a backlog of packages, but his requests were always denied. Richard felt singled out when he was asked to work "mark-ups" in the front office where management could watch him, a practice he has not seen before or since. Richard sometimes found himself receiving conflicting orders from different supervisors, such that obeying one would cause him to disobey the other, resulting in management complaints and occasions where he was angrily reprimanded. Once, Mann yelled at Richard for work done by someone else.

On June 12, Mann approached Richard from behind and forcefully elbowed him in the upper left arm. Richard turned

around to face Mann, who then handed Richard his paycheck. Although not physically injured, Richard suffered stress from the incident itself and as a result of workplace jokes that arose afterward. At the VA, Richard was diagnosed with having an "anxiety/stress reaction."

In June 1998, Richard bid on Route 201, a "curbline/ dismount" route that did not require him to carry two bundles of letters in one hand. Although he was the senior bidder, Richard was denied the route because the USPS determined that he was not "fit for duty." When Richard complained, management explained that the route contained a "park and loop" section that could not be appropriately altered to accommodate his disability. Richard later learned that a female colleague with a disability that was also aggravated by the DPS delivery system was assigned a route with a "park and loop" section and that the Post Office had accommodated her by simply excising that portion of her route and assigning it to someone else.

Dr. Forbes examined Richard on June 23 and found him to be fit for duty, although he suggested that accommodation be made for his problem with the DPS delivery system. When Richard returned from a vacation on July 13, the new station manager,

Katherine Dircks, told Richard that Dr. Forbes' report did not support a return to regular duty and that he should arrange for another medical examination at his own cost. Richard thus continued doing light duty office work. The following day, Richard was warned about using the phone for personal use. Shortly thereafter, he received written warnings for personal telephone use and conversing with co-workers, despite the fact that these activities were commonplace among all workers. Richard was constantly watched and monitored by both Mann and Dircks, with Mann following Richard so closely on one occasion that Richard found it physically intimidating.

In August 1998, Richard received a temporary assignment delivering mail on Route 1028, a "mounted" route out of West Station in Manchester. For the next year, Richard continued working temporary route assignments from West Station. Although Richard encountered no difficulties with his supervisors at West Station, he filed a second EEO complaint for retaliation in September 1998.

After a grievance arbitration on October 22, 1999, the Post Office reinstated Richard to Route 417. Once again working out of South Station, Richard felt that Dircks watched him constantly

to make sure he did not case DPS mail.  She accused him of doing so his first morning on the route, although he had not yet touched the mail, and once followed him on his route, stopping him to inspect his vehicle and to make sure that he had not cased the DPS mail in his truck.  Around the holidays, Dircks denied that Richard had won a gift certificate from an office drawing, when in fact he had.[5]  Richard felt that his work environment was so hostile that he requested a return to work at West Station. The union helped him arrange an agreement with management whereby he was able to do so.  On January 25, 2000, Richard filed another EEO complaint alleging retaliation.

On September 12, 2000, Richard initiated this lawsuit.  One week later, on September 19, 2000, Postmaster Collins changed Richard's start time from 8:00 a.m. to 9:00 a.m., a less desirable time because customers received their mail later, and Richard's deliveries could not be completed before dark during the  winter.  No other carriers had their schedules changed at that time.  Richard requested his start time of 8:00 a.m. be reinstated, but management did not do so until April 2001.  The USPS provided no explanation for either time change other than

_____

[5] The union investigated, and Richard was awarded the gift certificate later that day.

-11-

"operational needs."

In December 2000, a supervisor at West Station, Michael Taurinsky, noticed Richard favoring one arm. When Richard explained his disability, Taurinsky checked Richard's medical files and found nothing about his condition. Thereafter, he ordered Richard to submit medical documentation, which Richard did in January 2001. At some point during this process, Taurinsky said to Richard, "You disabled people are useless to us."

About a week after Richard submitted medical documentation to Taurinsky, West Station manager Brian Thomas told Richard that he had heard about Richard filing a lawsuit. At the same time, he ordered Richard to undergo a "fitness for duty" examination with Dr. Manning. In a report dated January 21, 2001, Dr. Manning found that Richard was "medically qualified to perform the essential functions of the position without accommodation." Richard initiated a third retaliation complaint on March 19, 2001.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one that affects the outcome of the suit.  See id. at 248.

In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-movant.  See Navarro, 261 F.3d at 94 (citation omitted).  The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v.

<u>Bristol Myers-Squibb Co.</u>, 95 F.3d 86, 94 (1st Cir. 1996) (citing <u>Celotex</u>, 477 U.S. at 323; <u>Anderson</u>, 477 U.S. at 249). While courts must exercise restraint in granting summary judgment where the nonmoving party must prove "elusive concepts such as motive or intent. . . summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Smith v. Stratus Computer, Inc.</u>, 40 F.3d 11, 13 (1st Cir. 1994) (citation and internal quotation marks omitted). I apply this standard in resolving the motion for summary judgment.

## III. DISCUSSION

### A.   Discrimination Based Upon Disability

To file an actionable claim of discrimination based upon disability under the Rehabilitation Act, a person must be a "qualified individual with a disability." 29 U.S.C. § 794(a). The Rehabilitation Act adopts the definition of disability found in the Americans with Disabilities Act ("ADA"), under which a medical diagnosis of an impairment does not automatically qualify an individual as disabled. <u>See</u> <u>Toyota Motor Mfg., Kentucky, Inc. v. Williams</u>, 122 S. Ct. 681, 690, 691 (2002). Instead,

-14-

"[c]laimants also need to demonstrate that the impairment limits a major life activity," and that the limitation is substantial. Id. at 690. Richard argues that his ulnar nerve damage limits his major life activities of performing manual tasks and working. The evidence, however, does not support either claim.

Richard has not shown that his impairment limits the major life activity of working because he has alleged only that he is precluded from working as an electrician (his job with the United States Army) and as a city letter carrier with the USPS. These allegations are insufficient because, as the Supreme Court recently held, a claimant is "required to show an inability to work in a 'broad range of jobs,' rather than a specific job." Toyota, 122 S. Ct. at 693.

Richard also fails to demonstrate that his impairment limits the major life activity of completing manual tasks. Richard's capabilities and limitations are very similar to those of the claimant in Toyota, where the Court found that the claimant's carpal tunnel syndrome, which "caused her to avoid sweeping, to quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances," did not "establish a manual-task disability as a

matter of law." 122 S. Ct. at 694. Richard has failed to distinguish his case from that of the claimant in Toyota. See id. Thus, Richard is not disabled within the meaning of the ADA and Rehabilitation Act.

Richard argues in the alternative that he is disabled because he has been regarded as such by the USPS. The ADA's definition of disability includes "being regarded as having such an impairment." 42 U.S.C. § 12102(2)(C). An individual can invoke this provision if: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999). Richard argues that the USPS regarded him as disabled because it afforded him hiring preference as a disabled veteran and acknowledged his Veterans Administration disability rating.

Richard's argument fails because, as the Court in Sutton makes clear, the inability to perform a single job cannot constitute a substantial impairment. 527 U.S. at 491. Because the USPS regarded Richard's impairment as only precluding him

from performing "park and loop" routes and recognized that he could still perform other types of routes and office work, it could not, by definition, have regarded Richard as having a substantially limiting impairment. Id.

Because Richard does not fall within the class of individuals with a disability protected by the Rehabilitation Act, defendants are entitled to summary judgment on Count I of Richard's complaint.

## B. Discrimination Based Upon Gender

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual with respect to his employment on the basis of his sex. 42 U.S.C. § 2000e-2(a)(1); White v. N.H. Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000). In a disparate treatment case, absent direct proof of deliberate discrimination, a plaintiff "must make out a prima facie case of discrimination, the employer must then come forward with some non-discriminatory justification, and the plaintiff finally is given the opportunity to convince the trier of fact that the justification was pretextual and that the real reason was discriminatory." Molloy v. Blanchard, 115 F.3d 86, 91 (1st Cir. 1997) (quoting Cuello-Suarez v. Puerto Rico Elec. Power

<u>Auth.</u>, 988 F.2d 275, 278 (1st Cir. 1993)).

Richard's Title VII gender discrimination claim arises from three alleged incidents of disparate treatment. The first two incidents occurred in 1995 and 1998 when Richard's supervisors prohibited him from casing his mail as an accommodation to his disability, but permitted female co-workers with similar disabilities to case their mail. The third incident occurred in 1998 when Richard was denied a "curbline/dismount" route containing a "park and loop" section because of his disability, but a female co-worker with a similar disability was permitted to excise a "park and loop" section from her route as an accommodation for her disability.

Defendants respond to Richard's allegations by contending in each case that they had non-discriminatory reasons for their actions. In the first case, defendants contend that the female co-worker was permitted to case her mail only temporarily and that Richard's circumstances are different because he required a permanent accommodation. In the second case, defendants assert that the female co-worker was mistakenly given permission to case her mail and that her supervisors corrected their mistake after Richard brought the matter to their attention. In the third

case, defendants assert that the female co-worker was granted a temporary alteration of her route pursuant to the union contract, whereas Richard has been seeking a permanent alteration to his route.

Richard has not demonstrated that defendants' non-discriminatory reasons for their actions are pretextual.  Nor has he produced any evidence suggesting that Richard was denied the accommodations sought because of his sex.  Accordingly, defendants are entitled to summary judgment on Richard's sex discrimination claim even if I assume for purposes of analysis that he has pleaded a prima facie case of discrimination.

## C.   Retaliation Claims

Counts II, III and V of Richard's complaint allege that the USPS unlawfully retaliated against him after he engaged in protected activity, in violation of the Rehabilitation Act, see 29 U.S.C. § 794(a), and Title VII of the Civil Rights Act, see 42 U.S.C. § 2000e-3(a).[6]  Absent direct evidence of retaliatory motive, Richard "must demonstrate circumstantial evidence of

---

[6] Richard's retaliation claims are analyzed despite the failure of his discrimination claims because when Richard filed his complaints, he reasonably believed he was protesting unlawful employment practices.  See Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 855 (1st Cir. 1998).

-19-

discrimination or retaliation via the three-part burden-shifting scheme outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973)." Sherman v. Runyon, 235 F.3d 406, 409 (8th Cir. 2000); see also White, 221 F.3d at 264. Under this burden-shifting scheme, Richard can establish a prima facie case if he shows by a preponderance of the evidence that: (1) he engaged in conduct protected by Title VII or the Rehabilitation Act; (2) he suffered an adverse employment action; and (3) the adverse action is causally connected to the protected activity. White v. N.H. Dep't of Corr., 221 F.3d at 262 (quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)). If Richard establishes his prima facie case, the burden of production shifts to the defendants, who must respond by articulating a legitimate, nondiscriminatory reason for the adverse employment action. See King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997). If the defendants meet their burden of production, the presumption of retaliation falls away and Richard must prove that the defendants' explanation is actually a pretext concealing a retaliatory motivation. See id.

1. Prima Facie Case

Defendants do not dispute Richard's claim that he engaged in

protected activities when he filed his internal complaints and commenced this action. See Sherman, 235 F.3d at 409-10 (formal or informal complaint concerning or opposing an employer's act may be protected under the Rehabilitation Act if employee reasonably believes such act violates statute); White, 221 F.3d at 262 (internal and EEOC complaints constitute protected activity under Title VII). Nor can they credibly argue that Richard did not suffer adverse employment actions. It is well understood that "[a]dverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" White, 221 F.3d at 262. In this case, Richard has alleged that as a result of his complaints: (1) management transferred him from Route 417 to office work a few days after he filed his second internal complaint; (2) management changed his route's start time from 8 a.m. to 9 a.m. one week after he commenced this action; and (3) he was subject to a retaliation-based hostile work environment consisting of a pattern of harassing conduct that included numerous requests for medical documentation, constant monitoring by management, an assault by his supervisor, and unwarranted

reprimands for behavior engaged in by all employees.  Richard's transfer, change in start time, and the pattern of harassment he allegedly was forced to endure each qualify as adverse employment actions.

To complete a prima facie case, Richard must demonstrate a causal connection between his complaints and the subsequent adverse employment actions.  A causal connection can be established by demonstrating a close temporal proximity between protected activity and an adverse employment action, see Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998), or through other factors including the sequence of events leading to the adverse action, departures from normal procedure, and any contemporaneous statements made by decisionmakers, id. at 168-69. The plaintiff's burden on this issue is "quite easy to meet." Id. at 165 (quoting Villanueva v. Wellesley College, 930 F.2d 124, 127 (1st Cir. 1991)).

Applying all these factors and drawing every reasonable inference in Richard's favor, a causal connection can be drawn between Richard's complaints and the claimed adverse employment actions.  Richard's removal from Route 417 and reassignment to office work occurred only days after he filed his second internal

complaint. Similarly, the September 2000 change in Richard's start time occurred exactly one week after he initiated this lawsuit. Finally, many of the incidents underlying Richard's hostile work environment argument occurred shortly after one of his complaints, or were accompanied by a remark that suggested a retaliatory motive. For example, Richard's first internal complaint of disability and gender discrimination, raised on March 12, 1998, was followed less than a month later by a meeting in which management criticized Richard for actions that did not normally warrant reprimand (such as talking with co-workers) and ordered more medical documentation. A few days after Richard filed a second internal complaint (on May 14, 1998), he was removed from his route and assigned to office work, during the course of which management watched him closely. Approximately two months after that, Richard received a letter reprimanding him for chatting with other employees. Finally, in January 2001, a manager at West Station approached Richard, stated that he had heard about Richard's lawsuit, and ordered Richard to undergo a "fitness for duty" exam. Given the close temporal proximity between Richard's complaints and the subsequent adverse employment actions, and the fact that Richard's supervisor

ordered a "fitness for duty" exam in response to his filing this suit, he has established a prima facie case of retaliation. See Hodgens, 144 F.3d at 168-69.

2. Defendants' Response

The defendants offer some legitimate, nondiscriminatory reasons for the adverse employment actions. Concerning Richard's transfer from Route 417 to office work, defendants suggest that they made a mistake due to confusion about whether Route 417 required Richard to carry two bundles of mail in one hand. In fact, Route 417 did not require this method, but management mistakenly thought otherwise. In response to Richard's allegation that he was subjected to a hostile work environment, defendants offer two explanations. First, they state that the reason for the multiple demands to submit medical documentation and undergo "fitness for duty" exams was to discern whether Richard was capable of performing his job duties. Second, they explain that management monitored Richard closely and reprimanded him both orally and in a letter for talking with other employees while on the job because Richard chatted with co-workers far too frequently. Defendants have offered no explanation, however, for the disadvantageous change in Richard's start time in September

2000.

### 3. Pretext

Richard relies substantially upon the temporal proximity between his protected activities and adverse employment actions to suggest that the defendants' proffered legitimate, nondiscriminatory reasons are actually a pretext for unlawful discrimination. While temporal proximity standing alone normally is not enough to overcome a plaintiff's burden at this stage of the analysis, in Richard's case the defendants' explanations are weak. They state only that Richard's transfer from Route 417 to office work was a mistake, and offer no explanation for the September 2000 change in start time. Furthermore, the defendants either deny Richard's allegations of a hostile work environment, or blame him for misbehaving at work. Given the close temporal proximity between events, the totality of the circumstances underlying Richard's hostile work environment claim, the poor and incomplete explanations provided by the defendants, and the existence of genuine disputes concerning facts material to the issue, a reasonable jury could conclude that the defendants retaliated against Richard after he filed his gender and disability discrimination complaints. Therefore, summary

judgment is not appropriate for Counts II, III and V.

## IV. <u>CONCLUSION</u>

Defendants' motion for summary judgment (doc. no. 24) is granted in part (Counts I and IV) and denied in part (Counts II, III and V).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

August 21, 2002

cc:  Jean-Claude Sakellarios, Esq.
     T. David Plourde, Esq.

-26-