**Joseph C. DRESSLER, Plaintiff**

v.

**COMMUNITY SERVICE COMMUNICATIONS, INC., Defendant**

**No. CIV. 02–171–B–K.**

United States District Court, D. Maine.

Aug. 6, 2003.

**18**

Joseph C Dressler, Winthrop, Pro Se, for Joseph C Dressler, Plaintiff.

S. Mason Pratt, Pierce, Atwood, Ella L. Brown, Pierce, Atwood, Portland, for Community Service Communications Inc, Defendant.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

*Pro se* Plaintiff Joseph C. Dressler filed suit against Defendant Community Service Communications, Inc. ("Commtel"), alleging that Commtel eliminated his position as head of its human resources department in retaliation for his exercise of rights protected by the federal Family and Medical Leave Act, 29 U.S.C. §§ 2601–2654, and Maine Family Medical Leave Requirements, 26 M.R.S.A. §§ 843–848. Additionally, Dressler alleged in his complaint that Commtel's decision to eliminate his position was motivated by age-based animus prohibited by the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634. Now pending is Commtel's Motion for Summary Judgment against all claims. In

[1]. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

response to Commtel's motion, Dressler wholly abandons his discrimination and retaliation claims and argues, exclusively, that his case is a FMLA "interference" claim premised on Commtel's failure to "restore" him as head of its human resources department following a period of intermittent FMLA leave. I **GRANT** Commtel's Motion.

### Summary Judgment Material Facts

The following facts are drawn from the parties' Local Rule 56 statements of material facts. They consist of undisputed facts and disputed facts taken in the light most favorable to Plaintiff. This factual presentation is limited to those facts that are material to Dressler's interference claim, Dressler having failed to articulate any other claim in his memorandum of law in opposition to Commtel's motion.

Commtel is a Maine-based telecommunications company. (Defendant's Statement of Material Facts, Docket No. 9, ¶ 1.) In 1997, Commtel expanded its business to offer various internet services in addition to its traditional telephone services. (*Id.*, ¶¶ 2, 3.) With Commtel's expansion into the internet service and data storage arena came not just the tripling of its workforce by June 2001, but also the commencement of a project to renovate some Portland real estate to house a large data center. (*Id.*, ¶ 16.) Sometime between the spring and fall of 2001, $14 million in anticipated, project-related financing fell through and Commtel found itself having unforeseen financial difficulties. (*Id.*, ¶ 22.) On top of this, by the fall of 2001 Commtel's internet business was flagging. (*Id.*, ¶ 16.) In October 2001, faced with these significant financial difficulties, Commtel laid off 45

employees, among them the Plaintiff, Joseph Dressler. (*Id.*, ¶¶ 11, 12, 15.)

Joseph Dressler began working for Commtel on or about March 11, 1996 as its Human Resources Manager. (Plaintiff's Separate Statement of Material Facts, Docket No. 11, ¶ 1.) In this capacity, Dressler was in charge of Commtel's Human Resources Department, having overall responsibility for the work of the Department, including "strategic planning" and other "company-wide policies and programs related to all aspects" of Commtel's human resource needs. (*Id.*, ¶ 2.)[2] During Dressler's tenure in office, Commtel made its foray into the internet services arena, with Dressler playing an important and productive role in various strategic planning initiatives. (*Id.*, ¶¶ 3–6, 8, 10, 12–16.) Between March 1996 and October 2000, Dressler received merit pay raises that increased his annual pay from $40,000 to $62,640. His performance reviews for this period were all positive. (*Id.*, ¶ 17; Defendant's Reply Separate Statement of Material Facts, Docket No. 14, ¶ 17.)

In August of 2000, Dressler's spouse experienced a "reoccurrence" of ovarian cancer. (Docket No. 11, ¶ 21.) Originally diagnosed in an advanced stage in the summer of 1997, her cancer was put in remission following surgery and chemotherapy. (*Id.*) Due to the recurrence of her cancer, Dressler's wife began a series of approximately 14 weekly treatments of Taxol in the summer of 2000. (*Id.*) From September 2000 through the end of the year 2000, Dressler took intermittent FMLA leave amounting to between 15 and 20 half days in connection with his wife's serious medical condition (Docket No. 9,

---

**2.** Commtel denies that Dressler played any role in relation to strategic planning, philosophy or direction when he was first hired, because the company's policies were already established when Dressler was hired, but it is apparent from the record that the Depart-

ment, like Commtel's workforce, grew appreciably during Dressler's tenure such that what may have been the case when he was hired, was not necessarily so shortly thereafter, even as early as 1997.

¶ 55.) Dressler concedes that Commtel's Chief Operating Officer ("COO"), to whom he reported, was aware of this intermittent leave and never expressed any hesitation to let Dressler take such leave. (*Id.*, ¶ 56.) In December 2000, the Dresslers learned that the Taxol treatment was not slowing the growth of the cancer and a new treatment regimen needed to be considered. (Docket No. 11, ¶ 21.)

While these unfortunate events were occurring for Dressler and his family, considerable changes were taking place in Commtel's business and workplace that, among other things, generated demands for "organizational development."[3] (Docket No. 9, ¶¶ 60, 63; Docket No. 11, ¶ 63.) In July 2001, while Dressler was still taking leave on an intermittent basis, Commtel restructured its Human Resources Department by simultaneously creating a Director position and hiring Leslie Harkins to fill the new position, effectively replacing Dressler as the head of the Department.[4] (Docket No. 9, ¶ 34.) Dressler characterizes this development as a demotion, offering that even though his title and salary were not changed, he lost overall responsibility for strategic leadership and other human resource functions, including recruitment, department budgeting, department staffing, department philosophy and being the primary contact for employees' human resource concerns. (Docket No. 11, ¶¶ 33, 38 Additional; Plaintiff's Opposition to Defendant's M.S.J.

and Inc. Memo. of Law, Docket No. 10, at 17–18.) Dressler also notes that the new arrangement required him to report to Harkins, a director, rather than to the company's COO. (*Id.*, ¶ 37 Additional.) Commtel characterizes the change quite differently, suggesting that "someone was brought in at the Director level, a job level above that of the manager level [Dressler] worked at, to meet business needs that resulted from the significant changes that the company was going through [and for which Dressler] did not have the [necessary] experience or skill sets." (Docket No. 14, ¶ 33 Responsive.) According to Commtel, it hired Harkins as Director of Human Resources, in part, because of organizational development experience she obtained while working at EnvisioNet, another Maine employer that went through a period of rapid growth, and also because of her experience working in human resources at L.L. Bean. (Docket No. 9, ¶¶ 73, 112.) At his deposition, Dressler admitted that his knowledge of organizational development was limited and that Commtel, if it wished to go forward with organizational development objectives first identified in January 2001, had to look outside the company. (*Id.*, ¶¶ 66, 68.) Following her hire, Harkins assumed overall responsibility for the Human Resources Department, understanding Dressler's duties to be limited to certain compensation and benefits projects, while Dressler sought to maintain control over a more expansive set of pro-

---

**3.** Organizational development is a buzzword that permeates the parties' filings. From the parties' descriptions, it appears that organizational development is a managerial methodology that seeks to maximize the performance of an organization through structural and cultural reorganization. Both sides appear to understand that the term describes a special set of skills, that one individual might have greater experience in organizational development than another, and that such experience might be highly valued by an employer engaged in an evolving business enterprise.

**4.** The summary judgment record reflects that Commtel created Directorships in numerous departments in 2001, including a Director of Telephone Operations, Director of Finance, Director of Regulatory Affairs, Director of Web Development, Director of Operations and Director of Customer Service, in addition to Director of Human Resources, and that the managers of each department were made to report to their new directors. (Docket No. 9, ¶¶ 184, 185, 187.)

jects, wanting to view Harkins's duties as limited to organizational development projects and internal supervision of department personnel. (*Id.*, ¶ 92; Docket No. 11, ¶ 92.)

On October 10, 2001, a group of Commtel's leaders convened a meeting in which they reviewed the company's financial statements and concluded there was a need for layoffs in light of serious financial problems and a recognition that the company's foray into internet services was turning out to be a failure. (Docket No. 9, ¶¶ 25–26.) Thereafter, a review was conducted of every department in the company in order to determine which positions might most easily be eliminated and have their functions reassigned. (*Id.*, ¶¶ 30–31, 33–37.) At the time of this review, five positions existed in the Human Resource Department: Director, Manager, Recruiter, Safety Coordinator, and Assistant. (*Id.*, ¶ 41.) The team in charge of Commtel's layoff review determined that all positions in the Human Resources Department would be eliminated except for the Director and Assistant positions. (*Id.*, ¶ 47.) According to Commtel, the team concluded that Dressler's responsibilities as Manager would be greatly diminished after October 2001 because (1) Commtel was finalizing yearly enrollment for its benefits plans and the remaining tasks could be handled by the Assistant, (2) Dressler's duties pertaining to employee compensation would be greatly diminished in light of a freeze on hiring and salary adjustments and (3) Dressler's remaining functions could be performed by Harkins in her role as Director. (*Id.*, ¶¶ 48–50.) The team determined not to eliminate the Director position because the company continued to need the organizational development and strategic leadership responsibilities of that position, including further restructuring of the workforce to meet the challenges fac-

ing the business. (*Id.*, ¶ 53.) The Assistant position was retained to perform, essentially, the Department's busywork. (*Id.*, ¶ 54.)

At the time of the October layoff, Dressler was continuing to take FMLA leave on an intermittent basis. (*Id.*, ¶ 174, Docket No. 11, ¶ 174.) Between January 2001 and October 2001, Dressler took four full days and 14 or 15 partial days of leave, all of which were related to his wife's serious medical condition[5] (Docket No. 9, ¶¶ 78–79.) Throughout 2001, Dressler's salary was $70,000. (*Id.*, ¶ 190.) Following the October 2001 layoff, Commtel conducted further layoffs in November 2001, and January, February and March 2002, affecting 42 additional employees and some entire departments. (*Id.*, ¶ 13.) In March 2002, Commtel closed its internet services business entirely. (*Id.*, ¶ 14.)

### Discussion

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In his complaint, Dressler alleged three causes of action, one premised on the Family and Medical Leave Act, 29 U.S.C. §§ 2601–2654 ("FMLA"), one premised on Maine's Family Medical Leave Requirements, 26 M.R.S.A. §§ 843–848 ("FMLR"), and one premised on the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"). I address Dressler's causes serially, but only to the extent that he advocates them in his summary judgment memorandum.

---

5. There is no suggestion by Dressler that he took any less leave than he needed.

## I. FMLA

In 1993 Congress enacted the Family and Medical Leave Act in light of its finding that, among other things, "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. §§ 2601(a)(4). In order to address this problem, Congress essentially promulgated a set of entitlements that benefit "eligible employees" who meet the statutory requirements set forth in 29 U.S.C. § 2611(2). Chief among these entitlements is the right to take up to twelve weeks of unpaid annual leave for certain medical and family circumstances, including "serious health conditions" faced by the employee or one of the employee's immediate family members. 29 U.S.C. § 2612(a)(1). Correlative to this basic entitlement to unpaid leave, the FMLA also entitles a qualified employee to be restored to his or her position or an equivalent position upon returning from leave. *Id.,* § 2614(a). Yet another entitlement is the right to take "intermittent" leave under certain circumstances, "such as to attend appointments with a health care provider for necessary treatment of a serious health condition." *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir.1998) (citing 29 U.S.C. § 2612(b)). "These rights are essentially prescriptive, 'setting substantive floors' for conduct by employers . . . ." *Id.* (quoting *Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712–13 (7th Cir.1997)). In addition to prescribing a set of leave entitlements, the FMLA makes it unlawful for an employer to (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise" any of the leave entitlements or (2) "discharge or . . . discriminate against" an employee for, among other things, exercising FMLA rights.[6] 29 U.S.C. § 2615(a) & (b). Should an employer do so, the FMLA authorizes the employee to seek redress in a private civil action. *Id.,* § 2617.

■ Courts addressing FMLA enforcement suits at the summary judgment stage have applied different burdens of proof depending on whether the claimant is seeking a remedy for "interference" under § 2615(a) or for "discrimination" under § 2615(b). When a claimant asserts a § 2615(b) claim that his or her employer imposed an adverse employment action in retaliation for the exercise of FMLA rights, courts, including the First Circuit Court of Appeals, hold that evidence of a discriminatory motive is required and utilize the McDonnell Douglas[7] burden-shifting framework to evaluate whether sufficient evidence of a discriminatory motive exists. *See, e.g., Hodgens,* 144 F.3d at 160 ("We . . . hold that, when there is no direct evidence of discrimination, the McDonnell Douglas burden-shifting framework applies to claims that an employee was discriminated against for availing himself of FMLA-protected rights."). Distinct from § 2615(b) discrimination claims are § 2615(a) "interference" claims. In interference cases, the McDonnell Douglass framework is bypassed because employer liability is not dependent on the existence of discriminatory motive; the prohibited interference or denial is sufficient alone to support an action. *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir.1999) ("If an employer interferes with

---

6. The wording of the anti-discrimination provisions does not literally prohibit the discharge of an employee in retaliation for taking FMLA leave, but such a prohibition has been inferred by the Department of Labor, 29 C.F.R. § 825.220(c), and the courts, *see, e.g., Hodgens v. General Dynamics Corp.,* 144 F.3d at 159–60; *Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112, 1122–23 (9th Cir.2001).

7. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (involving claim of discrimination under Title VII).

the FMLA-created right to medical leave or to reinstatement following the leave, a deprivation of this right is a violation regardless of the employer's intent."). Although the First Circuit Court of Appeals has yet to review a FMLA interference case, it has recognized that such claims are distinct from retaliation claims and that the McDonnell Douglas framework is not apt. *Hodgens,* 144 F.3d at 159 ("The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA.").

■ In his complaint, Dressler alleged both unlawful interference and retaliation. However, in response to Commtel's summary judgment motion, Dressler argued only his interference claim. I therefore focus on this theory of liability. The FMLA does not define interference, but the Department of Labor regulations indicate that interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such

leave. It would also include manipulation[8] by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b).[9] Dressler does not argue that Commtel interfered in any way with his right to take FMLA leave and for good reason. It is undisputed that Commtel provided Dressler with all of the leave he requested.[10] Nor does Dressler argue that Commtel manipulated matters in order to interfere with his entitlement to leave. Thus, we arrive at Dressler's core contention: that his termination in the October 2001 layoff interfered with his right to job "restoration."

## A. Dressler's claim of interference with a right to restoration is really a retaliation claim.

■ An employee who takes FMLA leave is entitled to be restored to the same or an equivalent position upon returning from leave. *Hodgens,* 144 F.3d at 159. The right to be restored is set forth at 29

---

8. The Department of Labor offers the following examples of unlawful manipulation:

(1) transferring employees from one worksite to another for the purpose of reducing worksites, or to keep worksites, below the 50–employee threshold for employee eligibility under the Act;
(2) changing the essential functions of the job in order to preclude the taking of leave;
(3) reducing hours available to work in order to avoid employee eligibility.

Manipulation cases have included situations in which an employer misinforms or fails to inform an employee of the existence of FMLA rights, or imposes adverse employment actions in anticipation of the employee's request for FMLA leave in order to make such leave unavailable. *See, e.g., LaCoparra v. Pergament Home Ctrs., Inc.,* 982 F.Supp. 213, 220 (S.D.N.Y.1997) ("We agree that an employer's failure to provide adequate notice of FMLA procedures may constitute interference with an employee's FMLA rights if it causes the employee to forfeit FMLA protections.").

9. Congress authorized the Department of Labor to promulgate regulations implementing

the FMLA. 29 U.S.C. § 2654. Accordingly, the department's reasonable interpretations of the statute are entitled to deference pursuant to *Chevron USA, Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

10. Courts have held that a claim of interference with the leave entitlement is not actionable unless the alleged interference actually caused the employee to forego or modify the exercise of his or her leave entitlement. *See, e.g., Alifano v. Merck & Co.,* 175 F.Supp.2d 792, 797 (E.D.Pa.2001) (concluding that plaintiff could not prove she was discouraged from taking FMLA leave because it was undisputed that she took leave); *Mardis v. Central Nat'l Bank & Trust,* 1999 U.S.App. LEXIS 7261, *8–9, 1999 WL 218903, *3 (10th Cir. Apr.15, 1999) (unpublished) (vacating entry of summary judgment against employee where evidence could support a finding that employer threatened employee with absolute forfeiture of accrued but unused vacation and sick leave if she applied for FMLA leave and that employee actually refrained from applying for FMLA leave as the result).

U.S.C. § 2614(a)(1), as limited by § 2614(a)(3). Pursuant to the limiting provision, a "restored employee" is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3). In other words, if an adverse employment action would have befallen an employee despite his or her leave-taking, then the adverse employment action would not amount to unlawful interference with the employee's restoration entitlement. *Id.; see also* 29 C.F.R. § 825.216(a). Three concerns jump to mind from Dressler's characterization of his case as a "restoration" case. One, the concept of restoration seems to assume that the employee has been absent from the workplace for a spell and has returned. The facts here are atypical of a true restoration scenario because Dressler was by far more present in the workplace than absent during his intermittent leave-taking. Between January 2001 and sometime in October 2001, or roughly a 41–44 week period, Dressler took approximately 11 total workdays of FMLA-qualifying leave. Two, rather than returning from a leave of absence ready to be "restored" to his job, Dressler continued performing his job throughout this period on, essentially, a full-time basis. Three, when Dressler was terminated in October 2001, his intermittent leave status was the same as it had been throughout the year. In other words, it is rather peculiar to describe Dressler as having been "on leave" from employment. Rather, Dressler appears to have been *actively* employed in a *continuous* manner in the *same position* at the *same pay* throughout the period in question. *See* C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been *continuously employed* during the FMLA leave period.") (emphasis added). Nevertheless, because Commtel does not address these concerns, I will follow Dressler's lead and view him as having been a reduced [11] leave employee.

■ Yet there is another analytical obstacle to Dressler's restoration claim. In the context of his case, Dressler's argument that he was "not restored" because he was taking intermittent leave is really an argument that an adverse employment action (layoff) was imposed on him because he was taking leave. This argument is, inherently, a retaliation argument. For if the taking of leave was a material factor in the decision to terminate his employment, it would amount to retaliation, not mere interference with or denial of the right to be restored. *Cf. De Arteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 943 (1st Cir.1988) (affirming summary judgment for the defendant in an age discrimination case where the record was devoid of evidence that age was a "material factor" in the employer's decision to discharge the plaintiff). Dressler's firing-is-a-denial-of-restoration-argument is simply a clever way of trying to shortcut his burden of persuading the Court that sufficient evidence exists in the record for a factfinder to reject Commtel's justification and to

---

**11.** The Department of Labor offers, "A reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday. A reduced leave schedule is a change in the employee's schedule for a period of time, normally from full-time to part-time." 29 C.F.R. § 825.203(a). Furthermore, "There is no limit on the size of an increment of leave when an employee takes intermittent leave or leave on a reduced leave schedule." However, an employer may limit leave increments to the shortest period of time that the employer's payroll system uses to account for absences or use of leave, provided it is one hour or less. *Id.*, § 825.203(d).

conclude, instead, that Dressler was terminated in retaliation for exercising his FMLA rights. For this reason, I conclude that the theory Dressler advances in his memorandum of law does not make out a § 2615(a) interference claim, only a retaliation claim masquerading as one. After all, the entire impetus of Dressler's case is that he was fired because of his need for FMLA leave in 2001. Indeed, had Dressler continued as a $70,000 per year Human Resources Manager after October 2001, there would be no FMLA restoration-interference claim, regardless of the fact that he was no longer the "head" of the Department, because Dressler cannot establish with the evidence he has presented that he was entitled to become Commtel's Director of Human Resources. 29 U.S.C. § 2614(a)(3)(B) (limiting the right to restoration to "any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.") Certainly there is no rational basis for inferring that Dressler's taking of intermittent FMLA leave was the reason that Commtel set about restructuring its departments and creating new director positions for them. Moreover, if this case were to go to trial, it is apparent that the question that would be charged to the jury would be whether Dressler was terminated because he was on FMLA leave, not whether he was "not restored" to his position as Human Resources Manager. In my view, the claim Dressler is trying to articulate is inherently a retaliation claim that must be subjected to the McDonnell Douglas framework because success on the merits of such a claim does depend on the existence of a retaliatory or discriminatory motive. *Hodgens*, 144 F.3d at 160 ("[Plaintiff] claims that his termination violated the FMLA because it was prompted by the fact that he took sick leave to which he was entitled under the statute. In such a case, the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.").

**B. Dressler has waived his FMLA and FMLR retaliation claims by failing to brief the issue of motive.**

In its principal summary judgment memorandum, Commtel argues that Dressler's FMLA and ADEA claims have no merit because Dressler cannot establish that his selection for layoff was based on animus toward his exercise of FMLA entitlements or his age. Commtel offers that its legitimate reason for laying Dressler off was, essentially, that he did not have a sufficiently broad palette of human resource skills to lead the Department into the future or to cover all of the necessary bases once the Department was downsized. (Defendant's M.S.J. and Inc. Memo. of Law, Docket No. 8, at 1, 11–13.) So stated, Commtel's memorandum of law was an invitation to Dressler to participate in the McDonnell Douglas burden shifting process in order to support any FMLA retaliation claim he might have. *Hodgens*, 144 F.3d at 160–61. Although Dressler makes a considerable effort to put forth factual statements that could inform a McDonnell Douglas analysis,[12] he fails to marshal any of these facts in his summary judgment memorandum to support his retaliation claim. Instead, Dressler's memorandum characterizes his case exclusively as an "interference" case involving the denial of his right to job restoration. Whether or not Dressler could meet his McDonnell Douglas burden is a question I ultimately

---

12. As already indicated, the statement of facts included in this Memorandum of Decision are limited to those facts that are material to Dressler's interference claim, for which motive is not an element.

do not reach, for I am not inclined to argue this aspect of his case for him. Because Dressler fails entirely to put forth any *argument* that might call into question the legitimate, non-discriminatory explanation Commtel offers for his termination, I treat his FMLA retaliation claim as abandoned. *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996) ("[P]ro se status does not relieve an employee of the obligation to meet procedural requirements established by law."); *Grenier v. Cyanamid Plastics,* 70 F.3d 667, 678 (1st Cir.1995) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived."); *Green v. New Balance Athletic Shoe, Inc.,* 182 F.Supp.2d 128, 136 (D.Me. 2002) ("Although Plaintiff makes much of [a workplace] slight in her statement of material facts, she fails to press any argument about its legal significance in her brief. Any claim arising from this occurrence is therefore deemed waived.").[13]

## II. ADEA

There is no basis in the summary judgment record for the Court to so much as determine the age of Dressler or any of his former colleagues. Moreover, Dressler fails to make any reference to his age discrimination claim in his summary judgment memorandum of law. The claim is therefore abandoned.

### Conclusion

For the reasons stated herein, I **GRANT** Defendant's Motion for Summary Judgment.

*SO ORDERED.*

---

**13.** This conclusion effectively disposes of Dressler's Maine FMLR claim as well. *Patterson v. Alltel Info. Servs.,* 919 F.Supp. 500, 505 n. 11 (D.Me.1996) ("Neither party has even suggested that analysis of the present facts under both statutes would yield different results. Therefore, this Court also finds that [defendant's] conduct with respect to [plaintiff] does not constitute a violation of the FMLR.").