STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-04-103

FILED & ENTERED
SUPERIOR COURT

JUL 28 2006

PENOBSCOT COUNTY

JLH-PEN-7/27/06

Carlton L. Davis,
    Plaintiff

v.

Decision and Judgment

Walpole Woodworkers, Inc.
    Defendant

Hearing was held on the complaint, in which Carlton L. Davis alleges that his employer, Walpole Woodworkers, Inc. (WWI), violated his rights under the Maine Family Medical Leave Requirements Act (MFMLRA), see 26 M.R.S.A. § 843 et seq., and under the federal Family and Medical Leave Act (FMLA), see 29 U.S.C. § 2601 et seq. At trial, both parties (including a representative of the corporate defendant) were present with counsel.

At the time of the events relevant to this case, Davis was a full-time employee (at least 40 hours per week) of WWI. He was first affiliated with the company as an independent trucker. In 1998, that relationship evolved into formal employment. For several years, he continued his work as a trucker, but in 2000, his responsibilities had changed so that he then operated a crane and slasher, which are used to move and process wood. Through the course of time in late 2001 until mid-2002, WWI gradually reduced its use of the crane and slasher, replacing it with a process deck. Along with that change, Davis' duties were adjusted correspondingly so that he worked increasingly on the process deck and less often on the crane and slasher. He was also given other assignments as the need arose. Throughout this time, he was paid $16 per hour.

In October 2002, Davis injured his back, and he reported the problem to two supervisors at work, including Scott Shorey. Davis did not know how he sustained the injury, and he reported that uncertainty as well. Davis continued to work until November 8, when the pain had increased to the point where he had difficulty performing his

1

employment duties. He reported this development to a supervisor and, with his supervisor's permission, went home. By November 11, Davis' condition had deteriorated, and on that date he was examined by his doctor, Carl Alessi, M.D. Dr. Alessi diagnosed a disc problem. On or about that date, Davis notified a supervisor at WWI that he was not able to work because of his back injury. Davis remained under Dr. Alessi's care until he was cleared to return to work effective January 15, 2003. At some point after the November 11 examination, Dr. Alessi issued a report confirming the back injury and attributing it to Davis' employment. The date of that and a subsequent report are not revealed in the record.

Although he was out of work because of his injury, between November 18 and 21, Davis also did not work because he previously had scheduled that time as vacation leave. On November 20, at Shorey's request, Davis met with Shorey. As part of his management responsibilities, Shorey decides which employees will be laid off, although someone else determines the number of layoffs. Typically, WWI lays off employees in late fall due to a decrease in demand for its wood products. At their November 20 meeting, Shorey told Davis that he (Shorey) needed to lay off another WWI employee, and he asked Davis if Davis would be willing to accept a layoff. In fact, Shorey intended to lay off Davis irrespective of Davis' response to Shorey's entreaty, but Shorey wanted to approach the issue disarmingly. As of that time, as Davis himself testified, Davis had not notified WWI that he would need additional time out of work because of his injury, and Davis did not know the extent of his back injury. (In fact, the extent of the injury was not revealed until Davis was examined by a neurosurgeon in early December.) However, as Shorey testified, one factor that prompted Shorey to lay off Davis was Davis' injury and Shorey's expectation that Davis would need time off from work to recuperate. That way, Shorey would not need to lay off some other employee who was physically capable of working. Davis agreed to be laid off. Another WWI employee was then assigned to do the work that Davis had performed prior to his leave.

The parties dispute whether during the November 20 meeting, Davis agreed to a layoff with an understanding that he would be recalled only when WWI had sufficient work to warrant rehiring Davis: Shorey testified that he told Davis that this would occur in February or March; Davis, on the other hand, testified that Shorey told him that he

2

would recall him when he was able medically to resume work. The court finds the latter account to be the more credible of the two. In the only other instance where Davis faced a layoff (in the fall of 2003), he agreed to be laid off because relief from employment fit in with other plans he had in mind.[1] This is consistent with the undisputed aspect of the circumstances that arose in November 2002, namely, that Davis agreed to be laid off for period of time (the amount of which is disputed) because he would be unable to work anyway due to his back injury. With such a layoff, he pursued (successfully) a worker's compensation claim, thus providing him with the prospect of some income during the layoff period. However, the court finds it unlikely that Davis would have agreed to a layoff that would have extended beyond the time when he was incapacitated and receiving benefits.

When Dr. Alessi removed Davis' work restriction in January, Davis promptly advised Shorey that he could return to his employment. Shorey, however, told Davis that because of the reduced workforce resulting from seasonal layoffs, there would not be any work available for Davis until several more months had passed. In fact, Davis was not called back to work until April 7, 2003. When he returned, he was initially assigned to the crane and slasher. However, within a short time following his return, he was re-assigned to the process deck, which is a lower paying position. Davis' hourly rate of pay was reduced from $16 to $10. At the time he was rehired that spring, Davis did not know that his pay would be reduced.

Davis was laid off again in December 2003 as part of WWI's seasonal workforce reduction. Davis had requested to be included among those employees to be laid off, although he subsequently changed his mind and asked to be retained.

Davis has framed his complaint in four counts. He alleges that WWI's refusal to reinstate him to employment in January 2003, when Dr. Alessi cleared him to do so, violated the protections granted him under the provisions of the MFMLRA and the FMLA (counts 1 and 3 respectively). Additionally, Davis contends that when WWI

---

[1] As it turned out, Davis attempted to rescind his consent to that layoff because, due to his wife's medical condition, he wanted to continue working so that he would maintain insurance coverage. However, WWI laid him off anyway.

3

rehired him in April, his reduced wages constituted retaliation against him for invoking his rights under the MFMLRA and FMLA (counts 2 and 4).[2]

The federal and state medical leave statutes set out the circumstances where its substantive protections arise. An employee receives the benefit of the state law protections when he has been employed by the same employer for twelve consecutive months and takes no more than ten consecutive weeks of "family medical leave" during a single two-year period. 26 M.R.S.A. § 844(1). The temporal predicate to this statute is satisfied by the evidence here. The remaining issue, discussed below, is whether, beginning in November 2002, Davis was on "family medical leave" within the meaning of section 843(4). Under the federal law, an employee qualifies for statutory leave protection if he is "eligible," see 29 U.S.C. § 2612(a)(1), which includes an employee who has been employed by the employer for at least 12 months and has worked at least 1,250 hours during the immediately preceding 12 months, see 29 U.S.C. § 2611(2). Davis is such an employee and thus was entitled to a total of 12 workweeks of leave during a 12-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). An employee who qualifies in these ways is entitled, under both state and federal law, to be restored either to his pre-leave employment position or to a position that carries equivalent status, compensation and terms after he returns from the qualifying leave. See 26 M.R.S.A. § 845(1); 29 U.S.C. § 2614(a)(1).

The court addresses, first, Davis' basic claims under the MFMLRA and the federal FMLA and, second, his claims of retaliatory conduct by WWI under both state and federal law.

### A. Basic family and medical leave claims

With respect to the first two claims, the court draws guidance from observations found in federal law that explains the purpose and elements of such claims brought under family and medical leave laws:

---

[2] Davis does not claim that WWI acted wrongfully when it laid him off in December 2003. Rather, he seeks relief based on the changed terms of his employment only up to that time.

4

> These rights are essentially prescriptive, "setting substantive floors" for conduct by employers, and creating "entitlements" for employees. . . .In such cases, the employer's subjective intent is not relevant. The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA -- for example, a twelve-week leave or reinstatement after taking a medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.

*Hodgens v. General Dynamics Corp.* 144 F.3d 151, 159 (1st Cir. 1998) (citations omitted).

From the evidence, the court concludes that as of November 20, Davis' absence from work constituted "family medical leave" within the meaning of 26 M.R.S.A. § 843. This statutory concept combines several elements of proof. First, the employee must have "requested" leave from employment. Here, Shorey initiated the discussion of a leave when he met with Davis on November 20 and asked Davis if he would agree to a lay off. As Shorey testified, one of the reasons he identified Davis as a lay off candidate was the need for Davis to take time off from work anyway to allow his injured back to heal. Thus, although Shorey's proposal to Davis had other concurrent roots – such as the basic need for WWI to lay off *someone* due to a seasonal slowdown in business --, Shorey himself cast the prospective leave from employment as one that was based in part on Davis' medical incapacity. Further, as is noted above, during the November 20 meeting, Davis accepted a layoff for the period of time when he could not work because of his back injury. Thus, even though the request may not have originated with Davis WWI, clearly was on notice that Shorey intended to remain out of work because of his injury while he recuperated, and WWI and Davis both agreed to that arrangement.

The nature of the leave to which the parties agreed was not framed explicitly as one that was based on the MFMLRA. Analogous federal law on which WWI relies, however, suggests that in order to invoke the protections of the federal FMLA, "[t]he employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave was needed." 29 C.F.R. § 825.303(b). Such is the case here. Davis did not cite MFMLRA directly. However, he revealed to Shorey that he was willing to remain on leave until he was medically fit to return to work, and in fact Shorey proposed that leave in part because of Davis' medically based work incapacity. The

parties' common understanding of the medical basis for Davis' leave from work was sufficient to satisfy this aspect of the statutory predicate.[3]

These findings also establish that Davis requested leave from employment because of his medical condition, thus satisfying the nature of the leave that Davis sought as one that qualifies as "family medical leave" under section 843(4). Finally, Davis' injury constituted a "serious health condition" under section 843(6), which is part of the applicable aspect of the definition of "family medical leave," because Davis' back injury amounted to an "injury" that involved "[c]ontinuing treatment by a health care provider." Here, Davis treated regularly with Dr. Alessi during the convalescent period, and he underwent diagnostic procedures such as an MRI and was examined by a neurosurgeon on referral from Dr. Alessi. This course of evaluation and treatment satisfies the terms of section 843(6).

For these reasons, Davis' absence from work beginning on November 20, 2002, constituted family and medical leave under the Maine statute.

Similarly, Davis' leave qualifies for protection under federal law. Title 29 U.S.C. § 2614(a)(1) casts such leave as one, in relevant part, that in fact is taken for the reason described in section 2612(a)(1)(D), which is discussed above, and that ultimately satisfies "the intended purpose of the leave. . . ." For the reasons noted above, Davis' leave that commenced on November 20 was attributable to "a serious health condition [that is, an injury that involved "continuing treatment by a health care provider," *see* 29 U.S.C. §

_____

[3] WWI argues in part that Davis did not provide WWI with medical records in November, thus leaving Davis' reasons for the leave ambiguous. For the reasons noted in the text, however, when Davis met with Shorey on November 20, Shorey told Davis that Davis was a good candidate for a layoff because he was unable to work in the first place, and Davis explained that he was willing to take a layoff for that reason. This makes the production of medical records unnecessary to trigger the provisions of the MFMLRA. However, under state law, WWI had the right to obtain verification of Davis' work incapacity. *See* 26 M.R.S.A. § 844(1)(B). WWI had a similar right as part of Davis' federally based protections. *See* 29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a). In general, the employer, rather than the employee, bears the burden of making inquiry sufficient to determine if a requested leave implicates the FMLA "[o]nce an employee gives notice, and the circumstances suggest that the employee's request may involve FMLA leave." *Wheeler v. Pioneer Developmental Services, Inc.*, 349 F.Supp.2d 158, 166 (D.Mass. 2004). Thus, to the extent that WWI wanted access to medical records and other pertinent documents beyond those it (or its representative) would have obtained as part of the related worker's compensation proceeding, it could have done so.

2611(11)(B)] that made [him] unable to perform the functions of" his position. Further, during Davis' actual leave for employment, he carried out its intended purpose: he was engaged in medical care and treatment for his injury. As soon as he had healed sufficiently to return to work, Dr. Alessi provided written confirmation of that progress, and Davis advised WWI that he was available.

WWI argues that Davis' leave resulted from seasonal layoffs that the company routinely must implement. The court agrees that this prompted WWI to make its decision to reduce its workforce. The question presented here, however, is whether the layoff of Davis in particular from that workforce was related to the fact of his injury and the need for him to remain absent from the workplace as he recuperated. The court has addressed this issue above in connection with Davis' basic claim that his leave qualified under both the MFMLRA and the FMLA. The issue also is generated by references beyond the statutory elements of an employee's claim under these enactments. In the Maine statute, an employee is not entitled to restoration of position and benefits "if the employer proves that the employee was not restored as provided this subsection because of conditions unrelated to the employee's exercise of rights under this subchapter." 26 M.R.S.A. § 845(1). The federal statute similarly provides that a restored employee is not entitled to a position or benefits other than those to which he would have been entitled in the absence of a qualifying leave. The administrative regulation addressing this issue states more specifically that "[a]n employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment." 29 C.F.R. § 825.216(a).

When WWI's argument is examined within this statutory and regulatory framework, it is apparent that WWI has not carried its burden of demonstrating that its decision not to rehire Davis in January, when he was cleared to return to work, was for reasons unrelated to the fact of his medical leave. As is noted above, Davis agreed to be laid off during the time he was recovering from his back injury. The court cannot conclude, however, that he agreed to a lay off longer than that duration; the evidence does not suggest that, unlike other times when Davis agreed to be laid off for a particular reason, he elected to forego income and other benefits of employment voluntarily. When the medical justification for the layoff ended, he still was not rehired. He ended up in

7

that position because of his medical leave. When he became able to work again, WWI did not restore him to employment, even though, despite the seasonal slowdown, his position remained active and was filled by another employee. Davis was the last employee to be laid off as a result of the seasonal slowdown. If he had not been laid off in November, then another employee would have been laid off in his place. And because no other employee was laid off after November 20, if Davis had retained his job, he would have kept it through the season.

For these reasons, the court concludes that Davis' leave from employment was protected leave under applicable state and federal law and that, under those laws, WWI wrongfully failed to restore him to employment when he regained the capability to work in January.

## B. Employer retaliation

Davis was rehired and back on the job beginning April 7, 2003. For several weeks, he was paid at the same hourly rate he had earned prior to the layoff. However, WWI unilaterally reduced his wages from $16 to $10. Davis argues here that this change in the terms of his employment constituted retaliation for Davis' exercise of his rights under the MFMLRA and FMLA. In order to prevail on such a claim, an employee must prove that he engaged in protected activity, that there was an adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action. *Hodgens*, 144 F.3d at 160. As the *Hodgens* court noted in the context of the federal law,

> the FMLA provides protection in the event an employee is discriminated against for exercising those rights. . . .In particular, "an employer is prohibited from discriminating against employees . . . who have used FMLA leave." . . . Nor may employers "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." . . .
> . . . In such a case, the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.

*Id.*, 144 F.3d at 159-60. Following the federal lead, the court uses the burden-shifting analysis to examine Davis's claim of unlawful retaliation. *See id.* Such an analytical model has been adopted by the Law Court in cases involving other forms of employment discrimination. *See, e.g., DiCentes v. Michaud*, 1998 ME 227, ¶ 14, 719 A.2d 509, 514.

8

Under that analysis, despite the conditional imposition of a burden of production on the employee, the employee-claimant retains the ultimate burden to prove by a preponderance of the evidence that his protected activity was a cause of the subsequent adverse employment action. *DiCentes*, 1998 ME 227, ¶ 16, 719 A.2d at 514.

Here, for the reasons noted above, the evidence establishes that Davis engaged in activity protected by law: he took a leave from employment that was covered by the protections of the MFLMRA and the FMLA. Further, the record also shows he was the subject of adverse employment action, namely, a reduction in his rate of pay. However, Davis has not demonstrated that there was a causal connection between the two.

Over the course of time prior to the November 2002 layoff, Davis spent less time working on the crane and slasher, and more time operating the process deck (which performed the same or similar function as the crane and slasher). The rate of pay for employees operating the process deck was less ($10 per hour) than for those operating the crane and slasher ($16). Because, however, Davis worked in the lower paying position as well as in the higher paid position, WWI gave him the benefit of the higher rate of pay. However, within several weeks of his return to work in April 2003, Davis worked nearly entirely on the process deck. Accordingly, his wages were reduced to $10 per hour. The court finds that this explains the reduction in pay. The court also finds no meaningful evidence to support a claim that the reduction is attributable to retaliatory animus. To the contrary, Davis was a reliable and valued employee who in fact was rehired after he healed. The only evidentiary basis that might be invoked to support a claim of causation is the temporal connection between Davis' return to work and the effective date of the adverse change in the terms of his employment. *Cf. DiCentes*, 1998 ME 227, ¶ 16, 719 at 514-15 (in employment discrimination cases, an inference of causation may arise from close temporal proximity between protected conduct and adverse employment action). Any such inference, however, is soundly undermined here by the factors noted above. Thus, Davis has not established that WWI acted wrongfully when it reduced his level of compensation after his return to work.

### C. Damages

As he has presented his claim in his written summation, Davis does not seek compensatory damages. Rather, he requests relief of statutory liquidated damages and an

award of attorney's fees. State law authorizes the assessment of liquidated damages of $100 for each day of a violation. *See* 26 M.R.S.A. § 848(1)(B).[4] For the reasons set out above, WWI acted in violation of the MFMLRA between January 15, 2003, (when Davis advised Shorey that he was medically eligible to return to work) and April 7, 2003, (when WWI rehired Davis, thereby bringing Davis' layoff to an end). This amounted to 82 days.

Although WWI denies that it is liable to Davis, it has not made a substantial argument on the question of damages itself. Thus, without reaching questions such as whether the limitations on damages included in the federal act can be read into the Maine statute, *see* note 4 *supra*, the court imposes damages as allowed by section 848. This amounts to $8,200.

Additionally, the plaintiff shall be entitled to an award of attorney's fees pursuant to 26 M.R.S.A. § 848(3) and 29 U.S.C. § 2617(a)(3).

The entry shall be:

On counts 1 and 3 of the complaint, judgment is entered for the plaintiff in the amount of $8,200, prejudgment interest at the annual rate of 4.28%, post-judgment interest of 10.36%, and reasonable attorney's fees. On counts 2 and 4 of the complaint, judgment is entered for the defendant.

Dated: July 27, 2006

Justice, Maine Superior Court

---

[4] The federal statute also authorizes an award of liquidated damages. *See* 29 U.S.C. § 2617(a)(1)(A)(iii). The amount of such damages is equivalent to an employee's actual damages plus interest. The federal statute precludes an award of liquidated damages or provides for a reduction of such damages when the employer proves that it acted in good faith and had reasonable ground to believe that its actions were not in violation of the FMLA. No such exceptions or limitations are included in the Maine statute.

10